Paul RICKETTS, Sr., et al., Plaintiffs,

v.

CITY OF COLUMBIA, MISSOURI,
et al., Defendants.

No. 90–4099–CV–C–66BA.

United States District Court,
W.D. Missouri,
Central Division.

Sept. 29, 1993.

Roger G. Brown, Roger G. Brown & Associates, Jefferson City, MO, for Paul Ricketts, Sr. and Kimberly Stephens.

Richard F. Huck, III, Evans & Dixon, St. Louis, MO, for City of Columbia, Ben White, City of Columbia Police Dept. and Ernie Barbee.

Eugene Buckley, Richard F. Huck, III, Evans & Dixon, St. Louis, MO, for Lawrence Brady, Craig Klein, B. Arnold, Dennis Veach and Randy Boehm.

Eugene Buckley, Evans & Dixon, St. Louis, MO, for Joseph Fagiolo and L. Calvert.

### *ORDER*

KNOX, United States Magistrate Judge.

#### Introduction

The events which led to the filing of this lawsuit are undeniably tragic and raise substantial questions concerning the liability of a municipality for the safety of its citizens.

Plaintiffs filed suit pursuant to the provisions of 42 U.S.C. § 1983, alleging their constitutional rights had been violated in several respects by the City of Columbia, Missouri, and several of its police officers and officials. The claims against defendants other than the City of Columbia, Missouri, were dismissed by the district court on the basis that those defendants were entitled to qualified immunity. The individual officers could not be held liable for damages because in 1986 and 1987, a reasonable officer would not have known that failure to arrest Sonny Stephens or act more aggressively in responding to plaintiffs'

complaints might constitute a violation of plaintiffs' constitutional rights. The parameters of the legal obligation of the police to respond to such incidents were not clearly defined in 1986 and 1987.

 Municipalities, however, are not entitled to qualified immunity and may be held liable for violations of the Constitution, even when the law is not clearly defined at the time the incident occurs. *See Owen v. City of Independence, Mo.*, 445 U.S. 622, 638, 100 S.Ct. 1398, 1408, 63 L.Ed.2d 673 (1980). Therefore, after written consent by the remaining parties, the case was transferred to the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636, for all further proceedings, including trial and entry of judgment.

Following an eight-day trial in March, 1993, the jury returned a verdict in favor of Kimberly Roth and Paul Ricketts, Sr., on their equal protection claims against defendant City of Columbia. Damages were assessed by the jury for Kimberly Roth at $200,000.00 on her claims relating to sexual assault on April 7, 1987, and at $200,000.00 on her claims relating to other harassment while orders of protection were in effect. The jury also assessed damages at $800,-000.00 in favor of Kimberly Roth and Paul Ricketts, Sr., for the wrongful death of Marge Ricketts.

Thereafter, on March 31, 1993, defendant filed a renewed motion for judgment after trial, pursuant to Fed.R.Civ.P. 50(b), and alternative motions for a new trial or for remittitur. Plaintiffs have responded in opposition to defendant's motion and defendant has replied.

The issue before the court is whether the defendant City of Columbia is liable for the injuries inflicted by the criminal acts of Sonny Stephens [1] when

(1) he harassed Kimberly Roth;

(2) he sexually assaulted Kimberly Roth on April 7, 1987; and

(3) he murdered Marge Ricketts on April 7, 1987.

---

**1.** At the time of the incidents giving rise to this lawsuit, Sonny Stephens was the estranged hus-

The acts of Sonny Stephens were his own individual acts. He was not acting in concert with any employee of the City of Columbia, or the Columbia Police Department. Further, the Columbia police had no advance warning Sonny Stephens was going to sexually assault Kimberly Roth on April 7, 1987, or going to kill Marge Ricketts on that date. Likewise, there is no evidence the police stood by or failed to respond to those incidents once notified. Thus, liability of the city cannot be based on a theory of accessory liability (acting in concert with Sonny Stephens) or failure to prevent a known threat (standing by and doing nothing on April 7, 1987).

Plaintiffs assert the city is liable because (1) it had a de facto policy of treating domestic disputes less seriously than other similar offenses or assaults; (2) the creation of the de facto policy was motivated by an intent to discriminate against women; and (3) the discriminatory policy caused or contributed to cause the injuries mentioned above. Plaintiffs contend the failure of the police to respond as aggressively as they do in non-domestic assault cases, pursuant to policy, "emboldened" Sonny Stephens, and therefore, the policy contributed to cause the attacks.

Defendant seeks judgment after trial on the basis that plaintiffs did not prove (1) defendant's policy caused plaintiffs' injuries; (2) the identity of the city's final policymaker; (3) an intent to discriminate; and (4) knowledge of a policy of discriminatory animus toward women by the city's final policymaker.

Defendant is correct that plaintiffs failed to prove defendant's policy (assuming it existed) was a legal cause of the injuries suffered by plaintiffs. There was no substantial evidence that, had the policy of the police department been different, the results would not have been the same. Plaintiffs also failed to prove the claimed policy was created with an intent to disfavor women and was adopted or acquiesced in by the city's final

---

band of plaintiff Kimberly Roth.

policymaker. Thus, defendant's motion for judgment as a matter of law is granted on all claims. Defendant's motion for a new trial would have been granted but for the decision of the court to grant judgment for defendant.

Although the rulings on the legal issues in this case are adverse to plaintiffs, the court recognizes, and is not insensitive to, the anguish which plaintiffs endured and the pain which will continue. Nevertheless, the court may not base its rulings on sympathy, but must address the legal issues in accordance with the current state of the law.

## Discussion

A motion for judgment after trial, under the provisions of Fed.R.Civ.P. 50(b), may be granted and judgment entered when the following are satisfied.

First, the motion for judgment after trial must be preceded by a motion for a directed verdict at the close of the nonmovant's evidence and at the close of all the evidence. Then, "the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion." *Id.*

Second, the motion for judgment after trial must be filed within ten days after entry of judgment. *Id.*

■ Third, all the evidence must point one way and be susceptible of no reasonable inferences sustaining the position of the nonmovant. *Brown v. Syntex Laboratories, Inc.,* 755 F.2d 668, 671 (8th Cir.1985). The court must consider all evidence in the light most favorable to the nonmovant, assume that the jury resolved all evidentiary conflicts in favor of the nonmovant, assume as true all facts the evidence tends to prove, and give the nonmovant the benefit of all favorable inferences that could be drawn from the facts that were proved. *Gilkerson v. Toastmaster, Inc.,* 770 F.2d 133, 136 (8th Cir.1985); *Midwest Communications, Inc. v. Minnesota Twins, Inc.,* 779 F.2d 444, 455 (8th Cir.1985), *cert. denied,* 476 U.S. 1163, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986).

■ The analysis the court engages in deciding a motion for judgment after trial and one for a new trial are different. In the latter, the court engages in a balancing process which results in a determination of whether a miscarriage of justice has occurred. *Goldsmith v. Diamond Shamrock Corp.,* 767 F.2d 411 (8th Cir.1985). Thus, even though there is evidence to support a verdict, the trial court may grant a new trial. When there is enough evidence to support a claim such that reasonable persons might differ as to the conclusions of fact to be drawn, however, a motion for judgment after trial must be denied. C. Wright, *The Law of Federal Courts,* § 95 at 640 (1983).

This is a case of first impression in this circuit. Plaintiffs base their claim on a new legal theory addressed in *Hynson v. City of Chester,* 864 F.2d 1026 (3d Cir.1988). Therefore, the court has relied on a variety of analogous cases in this circuit and on similar cases in other circuits. Similar attempts to hold local governmental organizations responsible for failure to protect the citizens of the community from crime have generally not been successful. *See DeShaney v. Winnebago County D.S.S.,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989); *Watson v. City of Kansas City, Kansas,* 857 F.2d 690 (10th Cir.1988); *McKee v. City of Rockwell, Tex.,* 877 F.2d 409 (5th Cir.1989).

It is worthy of note that none of the reported decisions directly on point have addressed post-trial matters and the proof required to make a submissible case at trial. Most of the reported decisions address either the doctrine of qualified immunity or whether there are sufficient facts in dispute to survive a motion for summary judgment. The cases have held that a municipality cannot be held liable under the due process clause for failing to protect an individual from private violence. Nevertheless, they have left open the possibility of suits against municipalities when the government selectively denies protection to certain disfavored minorities, in violation of the equal protection clause of the Constitution.

## Equal Protection Standard

■ Discrimination on the basis of gender is subject to review under the equal protection clause of the fourteenth amendment. *Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971). An intermediate

standard of judicial review has been developed for gender-based discrimination claims. Under the intermediate standard, an intentional gender-based classification or difference in treatment will be upheld if it substantially relates to an important governmental interest. *Craig v. Boren*, 429 U.S. 190 (1976).

■ "Although there is no general constitutional right to police protection, the state may not discriminate [on the basis of gender] in providing such protection." *Watson v. City of Kansas City, Kan.*, 857 F.2d at 694 (citing *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977)). Plaintiffs have the burden of demonstrating discriminatory intent and must prove that a purpose to discriminate against women was a motivating factor in formation of the policy. *Watson* at 694. Furthermore, a plaintiff must normally produce evidence outside the facts of plaintiff's own case to support the allegation of an unconstitutional municipal policy. *Watson* at 695.

Three essential elements in plaintiffs' equal protection claim are that (1) defendant's policy caused or contributed to cause plaintiffs' injuries; (2) the policy was created or adopted by defendant's final policy-making authority; and (3) the policy was intentionally discriminatory towards women.

Plaintiffs have failed, as a matter of law, to prove these elements. Thus, the verdict will be set aside and judgment entered for defendant.

### Causation

■ There was not sufficient evidence presented at trial from which a reasonable jury could find defendant's official policy[2] of treating domestic disputes less seriously than other disputes caused the death of Marge Ricketts or the sexual assault of Kimberly Roth.

■ A municipality may be held liable under section 1983 only where the municipality itself causes the constitutional violation at issue. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). *Respondeat superior* or vicarious liability is insufficient. *Monell* at 694–95, 98 S.Ct. at 2038.

■ "[P]roper analysis requires us to separate two different issues when a section 1983 claim is asserted against a municipality: (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation." *Collins v. City of Harker Heights, Tex.*, —— U.S. ——, ——, 112 S.Ct. 1061, 1066, 117 L.Ed.2d 261 (1992). The first question is "whether there is a direct causal link between the municipal policy or custom and the alleged constitutional deprivation." *Canton v. Harris*, 489 U.S. 378, 385, 109 S.Ct. 1197, 1203, 103 L.Ed.2d 412 (1989). "To establish proximate cause [under Missouri law], it is sufficient if there is substantial evidence which shows that the injury is a natural and probable consequence of the negligent act or omission." *Morrow v. Greyhound Lines, Inc.*, 541 F.2d 713, 718 (8th Cir.1976). The parties may use circumstantial evidence from which the connection may be reasonably inferred. *Morrow* at 718.

Proximate cause has also been explained as follows:

"An injury or damage is proximately caused by an act, or a failure to act, whenever it appears from the evidence in the case that the act or omission played a substantial part in bringing about or actually causing the injury or damage, and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission."

D.B. & W. § 80.18 (4th Ed.1987).

Plaintiffs must prove the challenged conduct was a substantial or motivating factor in causing the injury. *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). "Proof merely that such a policy or custom was 'likely' to cause a particular vio-

---

**2.** For purposes of this opinion, the court will treat the facts in the light most favorable to the nonmoving party and will assume, except as otherwise stated, there was sufficient evidence

showing defendant had a policy of treating domestic disputes and assaults less seriously than nondomestic disputes and assaults.

lation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact." *Spell v. McDaniel*, 824 F.2d 1380, 1388 (4th Cir. 1987). Plaintiffs have met neither the proximate nor the "but-for" causation test of the law.

The defendant in this case did not cause plaintiffs' injuries by murdering Marge Ricketts, sexually assaulting Kimberly Roth, conspiring with Stephens, or otherwise by aiding or abetting Stephens in his actions. The causes of Marge Ricketts' death and the sexual assault of Kimberly Roth on April 7, 1987, were the independent criminal acts of Sonny Stephens. The defendant, through its police department, was not present at the time of the criminal acts on April 7, 1987, and was not notified prior to the criminal acts that there was an immediate danger. The police had no notice of the April 7, 1987, incidents until after the shooting of Marge Ricketts had occurred and the assault of Kimberly Roth had begun. Thus, the police department was not in a position on the morning of April 7, 1987, to have physically prevented the murder of Marge Ricketts or the assault of Kimberly Roth by Stephens.

Likewise, defendant did not take affirmative steps to place Marge Ricketts or Kimberly Roth in increased danger. Defendant took no part in the creation of the dispute between Stephens and Roth or in the creation of the relationship which caused the dispute to be labeled domestic. Clearly, the crimes committed by Stephens were acts of private violence.

The evidence indicated this was a stormy relationship which lasted many years. In the final year of the relationship, Kimberly Roth obtained her first order of protection and allowed it to lapse because of threats by Stephens. Approximately six months later, she obtained a second order of protection. In the interim, police were not notified of threats by Stephens or injuries suffered by plaintiffs, if any.

While the second order of protection was in effect, plaintiffs reported several incidents of harassment and minor disturbances to the police. These incidents may or may not have been violations of the protective order. Although plaintiffs expressed an abstract fear of Stephens, any escalation of violence or threats was not made known to the police, who knew less of Stephens' violent nature than did plaintiffs.

Roth voluntarily talked to Stephens, alone, outside of the mobile home on at least one evening while the order of protection was in effect. Other contact with or by Stephens during this time was not reported to the police. Thus, the police department did not have a picture of the relationship from which they could have reasonably foreseen the devastating events of April 7, 1987.

Although plaintiffs presented some general evidence that defendant's policy may have "emboldened" Stephens, no evidence was presented showing the murder and assault by Stephens were the natural and probable results of that "emboldenment," that the policy caused Stephens to act criminally on April 7, 1987, or that the "emboldenment" was a substantial factor which lead to the ultimate injuries. The evidence simply did not show Stephens committed escalating acts of violence toward Kimberly Roth in response to police behavior over the period in question.

Plaintiffs' claim that the failure to deal more aggressively with Sonny Stephens "emboldened" him is speculative evidence of causation, at best. If this theory were sufficient under the law, every failure to arrest a person when there is probable cause could be deemed to be a cause of injuries inflicted by that person in like circumstances for the next six months, and would deprive police officers of any discretion in performing their duties. The law of causation does not extend liability that far. Plaintiffs have presented no evidence that if the police had followed a different policy, the conduct of Sonny Stephens on April 7, 1987, would have been different.

If the police had exercised their discretion, conducted additional investigations, filed written reports, and arrested Stephens on the prior occasions [3] when Kimberly Roth

---

**3.** The evidence indicated that the two more seri-

ous incidents when police were called by plain-

called the police, it does not logically follow that the murder and sexual assault would have been, or probably would have been, prevented. Plaintiffs seem to assume the police should arrest every time there is probable cause to do so. The law does not require it and police policy did not require it in either domestic or nondomestic cases.[4]

Mere arrest following telephone calls to the police would not have assured plaintiffs that Stephens would have been in police custody. Plaintiffs did not show Stephens would not or could not have posted a bond as he did on a prior occasion.[5] Furthermore, violation of the protective order was a "Class A" misdemeanor, with relatively minor consequences. § 455.085.7 and .8 RSMo.1986.

It is pure conjecture to claim Stephens would not have murdered Marge Ricketts and assaulted Kimberly Roth on April 7, 1987, if he had been arrested six months or two weeks prior to that date. Thus, the part any policy may have had in emboldening Stephens to commit these acts is too speculative under the facts of this case to show a direct causal link. *See S. v. D.*, 410 U.S. 614, 618, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973) (no showing that prosecution of third party would have resulted in relief from plaintiff's injury).

While official tolerance (through policy) of repeated misconduct may facilitate similar unlawful actions in the future, *Bielevicz v. Dubinon*, 915 F.2d 845, 851 (3d Cir.1990), the actions in this case are not similar in nature to Stephens' previous actions of harassment and verbal threats which were known to the police. The evidence did not tend to prove any official tolerance by defendant of misconduct in domestic disputes causing serious injury or of treating serious injury cases differently than nondomestic serious injury cases. Plaintiffs' own statistics show that in cases of major or serious injury to domestic

violence victims, arrests were slightly more likely to be made than in nondomestic cases. (Pl.Ex. 34, table 13.)

Therefore, plaintiffs have submitted insufficient evidence, as a matter of law, to prove the injuries inflicted on Marge Ricketts and Kimberly Roth on April 7, 1987, were caused by defendant's policy of treating domestic violence calls less seriously than similar calls which were not domestic in nature.

Plaintiffs have submitted marginally sufficient evidence, however, for the jury to conclude defendant's policy contributed to cause some harassment of Kimberly Roth while the orders of protection were in effect. Nevertheless, as will be discussed later, plaintiffs have failed to prove the de facto policy was the official policy of the city, and have failed to prove gender animus.

Even if plaintiffs had proven the other elements of the claim relating to harassment, a new trial would have been required. The evidence relating to the subsequent murder and sexual assault, the inclusion of state statutes in the jury instructions and evidence relating to the due process claims for which a directed verdict was entered, and a general confusion of the facts and legal issues relevant to that claim clearly affected the jury award on that claim. Thus, in light of the prejudicial error and lack of substantial justice on that claim, a new trial would have been ordered.

### Identification of Final Policymaker and Knowledge of Custom

"Official policy involves 'a deliberate choice to follow a course of action * * * made from among various alternatives' by an official who has the final authority to establish governmental policy." *Jane Doe A v. Special Sch. District*, 901 F.2d 642, 645 (8th Cir.1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483, 106 S.Ct. 1292,

---

tiffs, and Stephens was not arrested, were (1) five months, and (2) two weeks prior to the sexual assault and murder. The first incident is too remote in time to show a causal connection and the second incident appeared to have been diffused by the time police officers arrived.

4. Certain states have now adopted statutes mandating arrests under particular circumstances in

domestic abuse cases. Such a mandate was not in effect in Missouri during the times relevant to this lawsuit.

5. Stephens had quickly made bond and was released by the judiciary when arrested for another matter in February, 1987.

1300, 89 L.Ed.2d 452 (1986)). State law identifies who has the final authority to make policy. *Jane Doe A* at 645. "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not .constrained by the official policies of superior officials." *Feliciano v. City of Cleveland*, 988 F.2d 649, 655 (6th Cir.1993) (Chief of Police subordinate to Director of Public Safety pursuant to Cleveland, Ohio Code).

Defendant asserts the court erred in failing to grant judgment as a matter of law because plaintiffs "failed to produce any evidence, by way of municipal ordinances or regulations, identifying the City of Columbia's policymaker or law maker whose edicts or acts may fairly be said to represent the official policy of the City of Columbia." (Doc. 184, p. 2).

Defendant is correct that plaintiffs failed to produce evidence at trial which identified the person or persons with final policymaking authority for the City of Columbia or evidence that the person or persons with final policymaking authority had knowledge, actual or constructive, of the policy of treating domestic dispute cases differently.

In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 126, 108 S.Ct. 915, 925, 99 L.Ed.2d 107 (1988), the Court stated "a federal court would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it. And certainly there can be no justification for giving a jury the discretion to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself." The authority to make municipal policy is necessarily the authority to make final policy. *Praprotnik* at 127, 108 S.Ct. at 926.

At trial, plaintiffs produced no evidence which identified the final policymaker for the defendant on these matters, whether the Chief of Police was that person, or whether the Chief's decisions were subject to review and final approval by others within the city. Plaintiffs merely assumed the final policymaker (whoever it was) had actual or constructive knowledge [6] of the de facto [7] policy to treat domestic disputes less seriously. In this regard, the jury instruction identifying the chief of police as the final policymaker was in error. The court implicitly took judicial notice that the chief of police was the city's final policymaker. The court had no authority to do so. *See, e.g., Bryant v. Liberty Mutual Ins. Co.*, 407 F.2d 576 (4th Cir.1969); *Ruhs v. Pacific Power & Light*, 671 F.2d 1268 (10th Cir.1982); *Long v. J.R.*, 687 S.W.2d 255 (Mo.App.1985).

Without identifying the final policymaker, plaintiffs could not show the final policymaker had knowledge of the policy to discriminate. Knowledge of the discriminatory policy was a necessary element to be proved by plaintiffs. Constructive knowledge by police could be inferred from the evidence, but not knowledge by anyone outside the police department.

The documents submitted by plaintiffs in their response to defendant's motion which attempted to identify the final policymaker

---

**6.** In an analogous case, the United States Circuit Court of Appeals for the Eighth Circuit held "that to establish the existence of a governmental custom or failure to receive, investigate, or act on complaints of violations of constitutional rights, a plaintiff must prove:

1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;

2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and

3) that plaintiff was injured by acts pursuant to the governmental entity's custom, *i.e.*, that the custom was the moving force behind the constitutional violation."
*Jane Doe A. v. Special Sch. District*, 901 F.2d 642, 646 (8th Cir.1990).

**7.** Plaintiffs assert the City had a de facto policy of treating domestic disputes less seriously than nondomestic disputes. The written policy of the police department did not discriminate between these types of disputes, and state statute directed the same standard for response be used. Plaintiffs produced evidence, however, that the police had an unwritten custom of treating such disputes differently and less seriously, and that the unwritten custom amounted to a de facto policy of the department.

for defendant were not admitted into evidence at trial and will not be considered by the court at this stage in the proceedings. Plaintiffs' arguments that they can be considered by the court after the trial are not persuasive.

### Intent to Discriminate and Policy of Discriminatory Animus toward Women

■ Defendant asserts plaintiffs failed to show that the policy of treating domestic violence victims differently than nondomestic violence victims resulted from bias toward women.

As several Supreme Court cases recognize, "when a neutral law has a disparate impact upon a group that has historically been the victim of discrimination, an unconstitutional purpose may still be at work. But those cases signaled no departure from the settled rule that the Fourteenth Amendment guarantees equal laws, not equal results." *Personnel Adm'r of Massachusetts v. Feeney,* 442 U.S. 256, 273, 99 S.Ct. 2282, 2293, 60 L.Ed.2d 870 (1979) (veteran hiring preference held not gender-based although over 98 percent of veterans were male). *See also Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) and *Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "When a statute gender-neutral on its face is challenged on the ground that its effects upon women are disproportionately adverse, a twofold inquiry is thus appropriate. The first question is whether the statutory classification is indeed neutral in the sense that it is not gender-based. If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination. In this second inquiry, impact provides an 'important starting point,' but purposeful discrimination is 'the condition that offends the Constitution.'" *Feeney,* 442 U.S. at 274, 99 S.Ct. at 2293.

Although the case before the court involves a policy rather than a statute, the rule of law is equally applicable. The policy dealing with domestic violence, as set forth at trial, is gender neutral, but has a disproportionately adverse impact on women. Victims of domestic violence are not uniquely female; they include males, females, the elderly, and children of both sexes. The question then is whether plaintiffs have shown that a gender-based discriminatory purpose has, at least in some measure, shaped the policy on handling domestic violence calls for assistance.

To show discriminatory intent, plaintiffs offered evidence of statements made by police officers in certain situations. The comment "that's the way it goes," made in response to nonenforcement of a protective order and that the department was not "run right" does not outwardly show discriminatory intent toward women. Another comment that no arrest of Stephens should be made unless he was doing something illegal[8] because Roth would simply get back together with Stephens, also does not show a discriminatory intent toward women. It may, however, show a discriminatory intent toward domestic disputes. Regina Turner's statements to a domestic dispute victim that the department would not enforce her order of protection, like the statements above, show a bias against domestic disputes but not necessarily against gender.

The only truly gender-based statements offered into evidence were taken from a newspaper statement in which a police supervisor said that women victims are partly to blame for assaults by their husbands because of nagging. The evidence presented by defendant was that this statement was made in connection with a single incident and was taken out of context by the newspaper and the plaintiffs.

Other evidence indicated a difference in arrest rates and the number of written reports for domestic versus nondomestic disturbances in which the police were called. Plaintiffs provided evidence that domestic dispute victims were nearly all women, and thus, there was an adverse impact on women

---

8. As a general rule, arrests are not made unless an individual is doing something illegal or is believed to have done something illegal. Violation of the protective order was illegal activity pursuant to state statute; thus, the comment on its face does not necessarily mean that Stephens should not have been arrested.

from which bias toward women may be inferred. That showing of an inference of bias against women, however, is flawed by a lack of comparison with the number of nondomestic disturbances including women and the arrest and report rates for those situations. *See McKee, City of Rockwall, Texas,* 877 F.2d 409 (5th Cir.1989).[9] Plaintiffs implied, without producing evidence at trial, that the vast majority of nondomestic disputes involved only men.

In other words, plaintiffs produced evidence of only what happens when women make calls regarding domestic violence, but no comparison with treatment of women who make calls concerning nondomestic violence. Furthermore, the arrest rate figures do not indicate why arrests were not made, *i.e.,* because of a lack of probable cause, the situation had been diffused and the caller did not want the person arrested, or for some other legitimate or illegitimate reasons.

The evidence did not show the police department failed to respond[10] to domestic disturbance calls or that the response time for such calls was different from nondomestic disturbance calls. The only evidence plaintiffs submitted regarding the police department's failure to respond, as opposed to failure to arrest and write reports, was with regard to plaintiffs' own family. As set forth above, a plaintiff must normally produce evidence outside the facts of plaintiff's own case to support the allegation of unconstitutional custom or policy. *Watson* at 695.

Plaintiffs also argued the lack of separate written policy for handling domestic dispute calls showed a bias toward women. A fair reading of the statute requiring police departments to apply the same standard to domestic and nondomestic calls, however, might foreclose a separate written policy. § 455.080.2 RSMo.1980. Arguably, a separate written policy, unless it contained identical language, would create a different standard, such that the creation of a separate written policy would violate the statute. The absence of a separate written policy does not support plaintiffs' assertion of gender bias in this case.

Plaintiffs' historical evidence of discrimination against domestic violence complainants by police departments overall, and the gender-based nature of such discrimination, is little support for the proposition that the policy in Columbia was gender motivated, rather than due to dislike for domestic disputes.

The evidence in this case suggests a bias against domestic dispute calls, but does not meet the quantum of proof required to submit to the jury on the basis of gender bias.

### Governmental Interest

■ The final part of an analysis of gender-based discrimination claims is whether the difference in treatment, if any, substantially relates to an important governmental interest. *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Defendant did not concede a difference in treatment; thus, evidence directed toward showing the difference was substantially related to an important governmental interest was not introduced, and that portion of the law was not submitted in the jury instructions. Sufficient evidence was presented regarding police

---

9. In *McKee,* the court noted problems with plaintiff's statistics, including the "wide variety of factors which might influence the likelihood that police would make an arrest: whether the assault was in progress when police arrived; whether a gun or knife had been used; whether the victim had suffered obvious physical injuries and required medical attention; and whether the victim refused to press charges when the police arrived. Third, the statistics do nothing to suggest gender-based discrimination. The statistics do not indicate how many of the victims in the cleared assault cases were women, or how many of the victims in the domestic violence cases were men." *McKee* at 415.

10. Plaintiffs presented evidence of a Missouri statute which required police to "apply the same standard for response" to domestic violence calls as applied to any like offense involving strangers. § 455.080.2 RSMo.1980. The statute also required that such calls not be treated with a lower priority. Plaintiffs' position appears to be that the statutes require the police to handle the calls identically from start to finish, not just respond to them in the same way. While the statute is applicable to the due process claim because it arguably gives rise to a special duty to protect victims of domestic disputes, the equal protection claims submitted to the jury are not based on the statute but are based on the police department's policy.

training and the reasons for certain responses to domestic situations at a time when there was substantial dispute among experts as to the appropriate response to domestic disturbance calls to establish a rational basis for a difference in treatment of domestic from nondomestic dispute cases.

### New Trial

 Defendant alternatively seeks a new trial because the jury's verdict was against the weight of the evidence, the court permitted improper evidence, there was error in the jury instructions, and error in certain other areas. "Generally, new trials are granted only if the record presents prejudicial error or substantial justice has not been done." *Comerio v. Beatrice Foods Co.*, 616 F.Supp. 1423, 1428 (E.D.Mo.1985). The burden of demonstrating the verdict was against the weight of the evidence or showing prejudicial error is on the moving party. *Id.*

If the only element plaintiffs had failed to prove was causation, a new trial would be required on plaintiffs' claim for harassment. On the harassment claim, there was sufficient evidence of causation to allow the issue to go to the jury, but the claim would require submission to the jury without their having heard the evidence of the tragic death and assault of April 7, which were not caused by defendant's policy.

### Prejudgment Interest and Attorney Fees

On March 29, 1993, plaintiffs filed a motion for the assessment of prejudgment interest pursuant to the provisions of § 408.040.2 RSMo. (1987). Defendant has responded in opposition thereto and plaintiffs have replied. Plaintiffs have also submitted a request for attorney fees, and defendant has responded. These issues, however, are moot in light of the court's ruling.

IT IS, THEREFORE, ORDERED that defendant's motion of March 31, 1993, for judgment after trial is granted and judgment is entered in favor of defendant. [184–1] It is further

ORDERED that defendant's motion of March 31, 1993, for a new trial is denied as moot. [184–2]. It is further

ORDERED that defendant's motion of March 31, 1993, for remittitur is denied as moot. [184–3] It is further

ORDERED that plaintiffs' motion of May 6, 1993, for oral argument on the pending motions is denied. [200] It is further

ORDERED that plaintiffs' motion of March 26, 1993, for an assessment of prejudgment interest is denied as moot. [182] It is further

ORDERED that plaintiffs' motion of April 1, 1993, for attorney fees is denied as moot. [186]