857 F.2d 690
 57 USLW 2183
 Nancy WATSON; and Jason Fitch by Nancy Watson, Next Friend,
Plaintiffs- Appellants,
v.
The CITY OF KANSAS CITY, KANSAS; the Kansas City Kansas
Police Department; Alan Meyers; Officer Roger Golubski;
Sergeant Robert Wilkerson; Officer Henry Callahan; Officer
Rick Armstrong; Acting Sergeant Gregory Bradley; Officer
Richard Hartzfeld; Sergeant Melvin Cheek; Sergeant Donald
Woolery; Detective Sands; and Officer G, Defendants-Appellees.
 No. 86-2501.
 United States Court of Appeals,
Tenth Circuit.
 Sept. 14, 1988.
 
 Lynne J. Bratcher (G. Spencer Miller, of Miller & Dougherty, and Linda Dycus, Kansas City, Mo., with her on the briefs), of Miller & Dougherty, Kansas City, Mo., for plaintiffs-appellants.
 Daniel B. Denk, of McAnany, Van Cleave & Phillips, P.A., Kansas City, Kan., for defendants-appellees.
 Before McKAY, TACHA, and BALDOCK, Circuit Judges.
 TACHA, Circuit Judge.
 
 
 1
 This case involves claims arising out of the alleged failure to provide police protection to a victim of domestic violence and her son. The plaintiff, Nancy Watson, filed a federal civil rights action against the City of Kansas City, Kansas (City), its police chief, and a number of officers. She also alleged state law violations. The district court granted the defendants' motion for summary judgment on all claims and denied plaintiff's motion for reconsideration.[1] Plaintiff appeals. We affirm in part and reverse in part.
 
 
 2
 This case involves a long history of domestic violence. Because the record must be viewed in the light most favorable to the nonmoving party, Adickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970), we present, briefly, the plaintiff's version of the facts. Nancy and Ed Watson, Jr., were married for the first time on August 9, 1979. At that time, Nancy Watson already had a son, Jason Fitch, who was three years old. Nancy and Ed Watson had a daughter, Andrea, born on December 7, 1979. Ed Watson was a police officer with the Kansas City, Kansas Police Department (Police Department) from September 4, 1973, until his death on January 20, 1984. The Watsons experienced marital difficulties during their marriage, and Ed Watson physically abused his wife. Nancy Watson filed for divorce on January 6, 1981, and obtained a restraining order against Ed Watson. In February, 1981, Nancy Watson dismissed the divorce proceedings, but the Watsons were ultimately divorced on November 20, 1981.
 
 
 3
 Nancy Watson did not report to the police all of the incidents of abuse that occurred during this period. She did, however, report at least one incident. A few days before the divorce, Ed Watson shook a knife at her. She ran next door and called the police. Captain Hooks and some other officers responded. According to Nancy Watson, Captain Hooks told her, "Mrs. Watson, if you ever call the police again, I will see to it that you are arrested and you'll never see those two kids again."
 
 
 4
 On September 10, 1981, shortly before he and his wife were divorced, Ed Watson received severe head and facial injuries in a motorcycle accident. After the accident, his coworkers noticed and reported that he suffered from memory loss and confusion, and experienced periods where he seemed to be in a daze. As a result of these reports, the police department ordered Ed Watson to undergo psychological evaluation. He was approved to return to full-time work as a patrolman.
 
 
 5
 In July, 1982, Nancy and Ed Watson began seeing each other again. During this period, Ed Watson was not abusive; he maintained that he had reformed. On August 9, 1982, Nancy and Ed Watson were remarried. The first instance of physical abuse during the second marriage occurred on February 7, 1983. After that, Ed Watson went to their home many times while he was on duty and abused Nancy Watson.
 
 
 6
 On October 29, 1983, Ed Watson severely beat Nancy Watson with a flashlight. She required inpatient treatment at the University of Kansas Medical Center. She did not report this beating to the police immediately because she was afraid her children would be taken away from her as Captain Hooks had threatened.
 
 
 7
 On November 20, 1983, Ed Watson came home while he was on a break and brought with him an order from a fast food restaurant. Jason Fitch ate some of the food and vomited. Ed Watson struck his stepson several times and forced him to eat the regurgitated food. He also struck Nancy Watson. After Ed Watson left, Nancy Watson called the Police Department. She informed Sergeant Wilkerson of what had happened. She also informed him of the October 29th incident when Ed Watson had beaten her with a flashlight. She asked that Ed Watson be arrested. Ed Watson was not arrested, but Officer Golubski took an offense report.
 
 
 8
 On November 21, 1983, Nancy Watson gave a statement to Detective Sands concerning the events of the previous day as well as the October 29 attack with the flashlight. She also signed a formal complaint against Ed Watson. The offense report and Nancy Watson's statement were referred to the Internal Affairs Unit of the Police Department, and an investigation was begun. According to the Police Department's Internal Investigation Procedures, a Criminal Investigation Unit in the detective division is to investigate alleged violations of criminal laws. The Internal Affairs Unit is to investigate complaints not amounting to violation of criminal laws. On approximately December 15, 1983, the Internal Affairs Unit delivered its file to the Wyandotte County District Attorney's Office for possible criminal action. The Police Department took no disciplinary action during the investigation.
 
 
 9
 Mark Frey of the Kansas Social and Rehabilitation Service was assigned to investigate the child abuse charges. The Police Department told him not to contact Ed Watson.
 
 
 10
 On November 28, 1983, Nancy Watson filed for divorce. The court issued an order providing that Nancy Watson was to have the use, occupancy, and control of the parties' residence and restraining the parties from molesting or interfering with the privacy of the other.
 
 
 11
 On December 15, 1983, Ed Watson went to the family's residence where he held Nancy Watson and the children until December 18. On December 18, Nancy Watson called the police and requested assistance because Ed Watson had forced his way into the house, put a gun to her head, and threatened to kill both her and himself. Several police officers responded to the call shortly after Ed Watson returned to the house. Nancy Watson told the officers about the restraining order and requested that Ed Watson be arrested. Although Sergeant Cheek maintains that Nancy Watson did not request that Ed Watson be arrested, Officer Bradley testified that she wanted to press charges. Also, despite the existence of physical evidence, Bradley testified that he made no investigation of forced entry. He testified that an officer normally investigates the scene but that he did not do so because he was there "investigating a domestic disturbance, it was not classified as a forced entry...." The officers took no action and were preparing to leave when Nancy Watson called an abuse hotline. She described the situation and gave the names of the officers present. The officers then made a report but refused to arrest Ed Watson or order him to leave. When, after two hours, it became apparent that the officers would take no further action, Nancy Watson requested that she and her children be taken to a shelter for battered women. Nancy Watson later moved back home and had the locks changed.
 
 
 12
 On the evening of January 19, 1984, Nancy Watson and the children were driving home from the grocery store when they noticed Ed Watson following them. Nancy Watson drove directly to the police station and honked for assistance. Sergeant Woolery came out, and Nancy Watson told him that Ed Watson was following her. She asked Woolery to detain her husband so that she and the children could get home, and Sergeant Woolery told her that he would detain him. Woolery was aware of the Internal Affairs investigation. Nancy Watson drove directly home. However, when she and the children arrived, Ed Watson was already there. He forced the family into the house, locked deadbolt locks, and ripped out the telephones. He locked the children in their room and raped Nancy Watson. After the rape, he beat and stabbed her. When the knife he was using broke, he left her to go to the kitchen to get another one. While he was in the kitchen, Nancy Watson tried unsuccessfully to get out of the house through the front door. She then jumped through a picture window onto the front lawn. Ed Watson followed her through the window. A neighbor heard the disturbance and called the police. Ed Watson left in his car. One officer who responded to the call said to Nancy Watson that the whole situation was her fault because she had married Ed Watson. Three hours later it was discovered that Ed Watson had committed suicide at his brother's home. After Watson's death, Lieutenant Miller, the Police Department's public information officer and Ed Watson's former supervisor, told a Kansas City Star reporter that Ed Watson "was like a time bomb waiting to go off."
 
 
 13
 Nancy Watson filed suit under 42 U.S.C. Sec. 1983 claiming that the Police Department and the various individual police officers violated her right to equal protection under the law. She also filed suit under the Kansas Tort Claims Act.
 
 I. Section 1983
 
 14
 In considering whether summary judgment was appropriate in the present case, we begin by noting that the plaintiff's and defendants' versions of the events are significantly different. The presence of factual disputes, however, will preclude granting of summary judgment only if the disputes are genuine and concern material facts. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). We must look to substantive law to identify which facts are material. Id.
 
 Summary judgment must be entered
 
 15
 against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.
 
 
 16
 Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Furthermore, a dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. at 2510.
 
 42 U.S.C. Sec. 1983 provides:
 
 17
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 18
 Section 1983 does not create substantive rights. Rather it provides a recovery mechanism for deprivation of a federal right. To establish a cause of action under section 1983, a plaintiff must allege (1) deprivation of a federal right by (2) a person acting under color of state law. Gomez v. Toledo, 446 U.S. 635, 640, 100 S.Ct. 1920, 1923, 64 L.Ed.2d 572 (1980). In this case, Nancy Watson has alleged that the defendants' custom and policy of not providing assistance to victims of abuse by spouses in the same manner as other victims of assault deprived her of the equal protection of laws guaranteed by the fourteenth amendment.
 
 
 19
 The defendants do not contest that action under color of state law has occurred. Nor do they contest that failing to provide police protection is subject to the equal protection clause under section 1983. Bartalone v. County of Berrien, 643 F.Supp. 574, 576-77 (W.D.Mich.1986); Hawk v. Perillo, 642 F.Supp. 380, 384 (N.D.Ill.1985); Lowers v. City of Streator, 627 F.Supp. 244, 246 (N.D.Ill.1985); Thurman v. City of Torrington, 595 F.Supp. 1521, 1527 (D.Conn.1984). Although there is no general constitutional right to police protection, the state may not discriminate in providing such protection. Bartalone, 643 F.Supp. at 577; Lowers, 627 F.Supp. at 246.
 
 
 20
 A plaintiff in an equal protection action has the burden of demonstrating discriminatory intent. Village of Arlington Heights v. Metropolitan Housing Dev. Corp., 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); Washington v. Davis, 426 U.S. 229, 241-42, 96 S.Ct. 2040, 2048-49, 48 L.Ed.2d 597 (1976). It is not necessary to demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a motivating factor. Village of Arlington Heights, 429 U.S. at 265, 97 S.Ct. at 563 (discussing Washington v. Davis ). So, to survive summary judgment, the plaintiff must go beyond her pleadings and show that she has evidence of specific facts that demonstrate that it is the policy or custom of the defendants to provide less police protection to victims of domestic assault than to other assault victims. She must also provide evidence that discrimination was a motivating factor for the defendants and that she was injured by operation of the policy or custom.A.
 
 
 21
 We will first address the plaintiff's section 1983 claim against the City and several police officers acting in their official capacities, including the Police Chief, Alan Meyers. A suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same. Brandon v. Holt, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878 (1985); Monell v. Department of Social Servs., 436 U.S. 658, 690 n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978). Therefore we will consider Nancy Watson's claims against the City and the police officers acting in their official capacities as one claim.
 
 
 22
 Nancy Watson's claim does not involve a law which discriminates against victims of domestic violence. Rather she claims that the Police Department follows an unwritten policy or custom of responding differently and thus affording less protection to victims of domestic violence. It is well settled that the city may be liable for the plaintiff's injuries only if she can establish that her injuries were the result of an unconstitutional municipal policy or custom. City of Oklahoma City v. Tuttle, 471 U.S. 808, 817, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985); Monell, 436 U.S. at 691, 98 S.Ct. at 2036; Bartalone, 643 F.Supp. at 577. The policy or custom need not be formal or written. Monell, 436 U.S. at 691, 98 S.Ct. at 2036; see also Adickes, 398 U.S. at 167-68, 90 S.Ct. at 1613-14.
 
 
 23
 Much of plaintiff's evidence regarding what happened consists of her testimony in the form of her deposition. Defendants in most instances deny or contradict her version of the various events. Therefore factual disputes clearly exist. However, these factual disputes are immaterial if the plaintiff has offered insufficient evidence for a jury to find in her favor regarding discriminatory policy and intent. Normally a plaintiff must point to facts outside the plaintiff's own case to support the allegation of an unconstitutional municipal policy. Thurman, 595 F.Supp. at 1530. We have examined the record and find that the plaintiff has presented sufficient evidence that could allow a jury to find in her favor on her section 1983 claim.
 
 
 24
 First, the plaintiff has presented evidence showing that out of 608 nondomestic assault cases in Kansas City, Kansas, from January 1, 1983, to September 8, 1983, where there was a known perpetrator, there were 186 arrests for an arrest rate of 31%. Out of 369 domestic assaults, there were only 69 arrests for a rate of 16%.
 
 
 25
 The defendants argue that these statistics should not be considered. Apparently their argument is that the statistics are irrelevant and therefore inadmissible because they fail to take into account whether probable cause to arrest was present. Generally a failure to account for every variable will affect the weight rather than the admissibility of the statistics. See, e.g., Bazemore v. Friday, 478 U.S. 385, 400, 106 S.Ct. 3000, 3009, 92 L.Ed.2d 315 (1986). However, in some cases, the statistics may be so defective as to be inadmissible as irrelevant. Id. at 400 n. 10, 106 S.Ct. at 3009. So, we must consider whether the failure to account for probable cause renders the statistics irrelevant.
 
 
 26
 We find no merit in defendants' argument. Whether or not probable cause exists is not susceptible to statistical quantification. It represents a judgment call on the part of the officer or officers at the scene taking into account the particular circumstances. Although there are clearly guidelines, much depends on the individual officers' assessment. In the context of assaults, it is possible or perhaps even probable that officers' assessments as to whether probable cause exists are colored by whether the disturbance is domestic or nondomestic. The determination of whether probable cause exists may be subject to the same allegedly unconstitutional policy that leads to the discrepancy in arrest rates between domestic and nondomestic situations here. In other words, the determination of whether or not probable cause exists and the decision to arrest may present essentially the same issue. So, the failure to account for probable cause does not necessarily undermine the probative value of the statistics.
 
 
 27
 However, even though it is not irrelevant, plaintiff's statistical evidence alone may not be enough to prove the existence of a policy or custom. See McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 1767, 95 L.Ed.2d 262 (1987). We need not decide that issue, however, because the plaintiff has also presented evidence that police officers receive training in handling domestic violence situations, and that the training encourages officers to attempt to "defuse" the situation and to use arrest as a last resort.
 
 
 28
 Furthermore, the plaintiff's version of events regarding her own situation, if believed, may demonstrate a pattern of deliberate indifference on the part of the Police Department. Such a pattern, when examined in the context of other evidence the plaintiff has presented, constitutes evidence of a custom or policy. In Thurman, the plaintiff alleged that she requested assistance from the police many times over an eight month period because of threats upon her life by her estranged husband. She made several attempts to file complaints against her husband which were ignored or rejected by the police department. In considering the defendants' motion to dismiss, the court held that such a pattern raises an inference of a municipal custom or policy. 595 F.Supp. at 1530. In the present case, we need not decide whether demonstration of such a pattern, by itself, could establish an unconstitutional municipal custom or policy. We note, however, that this is an equal protection claim, and because there is no general constitutional right to police protection, Bartalone, 643 F.Supp. at 577; Lowers, 627 F.Supp. at 246, the plaintiff must demonstrate that she was treated differently because of her membership in a certain class. We doubt whether evidence of deliberate indifference in the plaintiff's case alone would be sufficient evidence of different treatment. We do find, however, that taken with the other evidence plaintiff has proffered, a pattern such as the one alleged by plaintiff in this case constitutes some evidence of custom or policy.
 
 
 29
 When all of the plaintiff's evidence is considered, it is sufficient, if believed, to support a jury finding that the City and Police Department followed a policy or custom of affording less protection to victims of domestic violence than to victims of nondomestic attacks. Furthermore, a jury could infer, based on this evidence, that the City and Police Department acted with a discriminatory motive in pursuing this policy, and that her injuries were a result of the policy. The district court therefore erred in granting summary judgment to the City.
 
 
 30
 We note that in addition to her allegation of class-based discrimination based on her status as a victim of domestic violence, Nancy Watson argues at some points in her brief that she was denied police protection because of her sex. To the extent that Watson's lawsuit asserts a claim of class-based discrimination based on sex, we affirm the district court's grant of summary judgment for the defendants.
 
 
 31
 In order to properly address plaintiff's sex-based claim we will assume that the City has established a policy which provides less protection to victims of domestic violence than to other victims of assault. Such a policy is gender-neutral on its face; thus, any challenge based on the ground that its effects upon women are disproportionally adverse triggers a twofold inquiry. Personnel Adm'r v. Feeney, 442 U.S. 256, 274, 99 S.Ct. 2282, 2293-94, 60 L.Ed.2d 870 (1979).
 
 
 32
 The first question is whether the classification is indeed neutral in the sense that it is not gender-based. Id. "If the classification itself, covert or overt, is not based upon gender, the second question is whether the adverse effect reflects invidious gender-based discrimination." Id. The fatal omission for the plaintiff in this case is that she has failed to present any evidence of adverse impact. The evidence presented does not show that a policy which discriminates against victims of domestic violence adversely affects women. Even if the plaintiff had presented evidence of adverse impact, the burden she would have to bear to survive summary judgment would be a heavy one. In Feeney, the plaintiff challenged a veteran's preference policy which favored men at a rate of ninety-eight percent. Id. at 270, 99 S.Ct. at 2291. Notwithstanding such an adverse impact on women, the Court rejected the plaintiff's gender-based discrimination claim because she could not show that the classification was adopted to purposefully discriminate against women. Id. at 278-79, 99 S.Ct. at 2295-96. Here we have no evidence of either adverse impact or discriminatory purpose. Watson has failed to state a prima facie case for sex-based discrimination.[2]
 
 B.
 
 33
 The basis for the district court's order granting summary judgment for defendants in their individual capacities is unclear. The court's decision appears to have been based in part on its disposition of the "municipal policy or custom" claim. The court did not address the defendants' claim for qualified immunity. Given our reversal of the district court's conclusion regarding the claim against the City, the court on remand should determine whether qualified immunity shields these individual defendants notwithstanding the presence of a section 1983 claim against the city. In making this determination the court must decide whether the actions of these defendants violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Whether the law is clearly established "should be determined in a particularized sense." Garrett v. Rader, 831 F.2d 202, 204 (10th Cir.1987); see also Anderson v. Creighton, --- U.S. ----, 107 S.Ct. 3034, 3039 n. 2, 97 L.Ed.2d 523 (1987) ("contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right").
 
 
 34
 We note that there is no inherent inconsistency in allowing a suit alleging an unconstitutional policy or custom to proceed against the city when the individuals charged with executing the challenged policy to indure the plaintiff have been relieved from individual liability. While it would be improper to allow a suit to proceed against the city if it was determined that the officers' action did not amount to a constitutional violation, City of Los Angeles v. Heller, 475 U.S. 796, 798-99, 106 S.Ct. 1571, 1572-1573, 89 L.Ed.2d 806 (1986), there is nothing anomalous about allowing such a suit to proceed when immunity shields the individual defendants. The availability of qualified immunity does not depend on whether a constitutional violation has occurred. While a government official who violates the constitution will be protected if his or her actions were reasonable in light of clearly established law and the information the official possessed when he or she acted, municipalities enjoy no such shield. See Owen v. City of Independence, Mo., 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980).
 
 II. State Tort Claim
 
 35
 In her claim under the Kansas Tort Claims Act against the City and Sergeant Woolery, plaintiff Nancy Watson alleges that she suffered injury due to Woolery's negligence in failing to detain Ed Watson as he said he would on January 19, 1984. Under the Kansas Tort Claims Act, governmental liability for tort claims is the rule. Fudge v. City of Kansas City, Kan., 720 P.2d 1093, 1097 (Kan.1986). There are, however, numerous exceptions. Id. The defendants argued below that three of these exceptions apply to the facts of the present case. The district court found that Kan.Stat.Ann. Sec. 75-6104(m) (1984), which provides an exception to liability for "failure to provide, or the method of providing, police or fire protection," applies and makes the defendants immune from suit.
 
 
 36
 Plaintiff relies on the Kansas Supreme Court's decision in Fudge v. City of Kansas City, Kan., in arguing that the district court erred. In Fudge, the city and city police officers were held liable for failure to take into custody an intoxicated person who caused an automobile accident in which the husband and father of the plaintiffs was killed. The court in Fudge considered whether 75-6104(m) applied. The court noted the following discussion of this exception from an earlier case:
 
 
 37
 We believe subsection (m) is aimed at such basic matters as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options. Accordingly, a city is immunized for such claims as a burglary could have been prevented if additional police cars had been on patrol, or a house could have been saved if more or better fire equipment had been purchased. We do not believe subsection (m) is so broad as to immunize a city on every aspect of negligent police and fire department operations. Should firemen negligently go to the wrong house and chop a hole in the roof thereof, we do not believe the city has immunity therefor on the basis the negligent act was a part of the method of fire protection.
 
 
 38
 Fudge, 720 P.2d at 1099 (quoting Jackson v. City of Kansas City, Kan., 680 P.2d 877, 890 (Kan.1984)). The court then concluded that the police action at issue in Fudge did not fall within this exception and defendants were not immune on this ground. Fudge, 720 P.2d at 1099.
 
 
 39
 The facts of the present case are similar to the facts in Fudge. Both involve questions of negligence on the part of individual officers in carrying out their duty to protect particular members of the public.[3] The present facts clearly do not involve a question such as how many patrol cars are to operate in a given area at a particular time. Thus we conclude that the district court erred in granting defendants summary judgment on the ground that the exception in 75-6104(m) applies.[4]
 
 Conclusion
 
 40
 The district court's order granting summary judgment to the City and to the defendants sued in their official capacity is reversed. The court is instructed to determine whether the defendants who were sued in their individual capacity are entitled to qualified immunity. The court's grant of summary judgment under the section 75-6104(m) of the Kansas Tort Claims Act is also reversed. In all other respects, the district court's decision is affirmed. The case is remanded for further proceedings consistent with this opinion.
 
 
 41
 AFFIRMED IN PART AND REVERSED IN PART.
 
 
 
 [1]
 Plaintiff presented additional evidence to the district court on motion for reconsideration. At oral argument, the defendants argued that this additional evidence was not properly before the court and should not be considered in deciding whether summary judgment should have been granted. Because the district court in fact reconsidered its decision and took into account the new evidence, we will consider all of the evidence presented to the district court including the evidence presented by the plaintiff on motion for reconsideration
 
 
 [2]
 There are two additional Sec. 1983 claims mentioned but not argued in plaintiffs' brief on appeal: (1) a Sec. 1983 claim on behalf of Jason Fitch alleging police failure to provide assistance because of the family relationship between Jason Fitch and the perpetrator Ed Watson, and (2) a Sec. 1983 claim on behalf of Nancy Watson and Jason Fitch alleging police failure to provide assistance because the perpetrator was a police officer. It is not clear that the granting of summary judgment on these claims has been appealed. Nevertheless we have reviewed the record and find that the plaintiffs have not put forth evidence regarding all elements of these claims. Therefore the granting of summary judgment on these claims must be affirmed
 
 
 [3]
 We note that breach of a duty to the general public is not enough to create liability under the Kansas Tort Claims Act. There must be a special duty owed to the injured party. Fudge, 720 P.2d at 1098. However, the question whether a special duty exists is distinct from the question whether an exception to liability applies. Id. at 1097. In the present case, the district court found that a special relationship existed between Sergeant Woolery and Nancy Watson. This finding is not challenged on appeal
 
 
 [4]
 In their motion for summary judgment, the defendants also argued that exceptions 75-6104(c) and (d) apply. Kan.Stat.Ann. 75-6104(c) (1984) creates an exception for "enforcement of or failure to enforce a law, whether valid or invalid, including, but not limited to, any statute, regulation, ordinance or resolution." Kan.Stat.Ann. 75-6104(d) (1984) grants immunity for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee, whether or not the discretion be abused." The district court found that these exceptions are not applicable to the present facts. These findings are not challenged on appeal