Willie SEVIER, Individually; as Parent and heir at law of Gregory Sevier, Deceased, and as administrator of the estate of Gregory Sevier, and Orene Sevier, Individually; as Parent and heir at law of Gregory Sevier, Deceased, Plaintiffs,

v.

CITY OF LAWRENCE, Ted J. Bordman, James H. Phillips, W. Ronald Olin and George T. Wheeler, Defendants.

No. 92–4261–SAC.

United States District Court, D. Kansas.

May 27, 1994.

Catherine A. Walter, Wright, Henson, Somers, Sebelius, Clark & Baker, Topeka, KS, Lance W. Burr, Lawrence, KS, for plaintiffs.

Gerald L. Cooley, Allen, Cooley & Allen, Lawrence, KS, for defendants.

## MEMORANDUM AND ORDER

CROW, District Judge.

On November 18, 1992, the plaintiffs filed an eleven-page, five-count complaint. The plaintiffs, on behalf of themselves and their deceased son, seek, inter alia, compensatory and punitive damages from the defendants under 42 U.S.C. § 1983. The plaintiffs allege that the defendants' actions constituted a violation of both the plaintiffs' and the decedent's constitutional rights. All of the human defendants are sued individually and in their official capacities as police officers for the City of Lawrence.

To summarize, the complaint alleges that on April 21, 1991, the plaintiffs, concerned about their son, Gregory Sevier, placed an emergency call to the 911 service in Lawrence, Kansas. The 911 dispatcher was advised that Gregory Sevier had a knife and that the Sevier's wanted someone to check on him.

Officer Bordman was the first officer to arrive at the Sevier home. Without consultation with the Sevier family, Officer Bordman made contact with Gregory Sevier by shouting orders and acting in a confrontational manner. Officers Phillips and Wheeler subsequently arrived at the Sevier home. Although Gregory Sevier posed no significant threat of death or serious injury, Officers Bordman and Phillips fired their service revolvers at Gregory Sevier. Gregory Sevier was struck with six bullets and was killed as a result of this gunfire.

Count I alleges that the acts of the defendants deprived the decedent of his constitutional rights, privileges and immunities, and that the acts were carried out under color of the statutes, regulations, customs and usages of the City of Lawrence and the State of Kansas, pursuant to the official policy of the City of Lawrence. Specifically, Count I alleges that the defendants deprived the decedent of his Fourth Amendment right to be free of unreasonable searches and seizures and his Fourteenth Amendment right not to be deprived of life, liberty or property with-

out due process and equal protection of the laws.[1]

Count II alleges that the Lawrence Police Officers received inadequate training in responding to suicide-related emergency calls which amounts to a deliberate indifference to the constitutional rights of the decedent. Specifically, the conduct of the defendants deprived the decedent of his Fourth and Fourteenth Amendment rights.[2]

Count III alleges that the plaintiffs are Native American, as was the decedent, and that response to 911 emergency calls placed by Native Americans is treated differently than similarly situated white families in Lawrence. The plaintiffs allege that this disparate treatment is the result of a pattern, practice and policy of discrimination against Native Americans by the City of Lawrence.[3]

Count IV alleges that Officer Bordman's and Officer Phillips' use of excessive force caused Gregory Sevier's death.

Count V alleges that conduct of the officers was so extreme, egregious and outrageous so as to constitute a tort of outrage.

This case comes before the court upon the defendants' motion for summary judgment (Dk. 60). In the memorandum in support of that motion, the defendants seek summary judgment in regard to all of the plaintiffs' federal claims and request the court to decline to exercise jurisdiction over the plaintiffs' supplemental state law claims, or in the alternative, grant summary judgment to the defendants on those claims.

The plaintiffs have filed a response to the defendants' motion. In that response, the plaintiffs deny that the defendants are entitled to summary judgment.[4] The defendants have filed a reply.

The court, having considered the briefs of counsel, the numerous exhibits attached to those briefs, and the applicable law, is now prepared to rule.

### Standards for Summary Judgment

A court grants a motion for summary judgment if a genuine issue of material fact does not exist and if the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The substantive law governing the suit dictates which facts are material or not. *Id.* at 248, 106 S.Ct. at 2510. "Only disputes over facts that might affect the outcome of the suit under the governing law will ... preclude summary judgment." *Id.* There are no genuine issues for trial if the record taken as a whole would not persuade a rational trier of fact to find for the nonmoving party. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "[T]here are cases where the evidence is so weak that the case does not raise a genuine issue of fact." *Burnette v. Dow Chemical Co.*, 849 F.2d 1269, 1273 (10th Cir.1988).

The movant's burden under Rule 56 of the Federal Rules of Civil Procedure is to lay out the basis of its motion and to "point to those portions of the record that demonstrate an

1. In a memorandum and order entered on May 28, 1993, the court granted the defendants' motion to dismiss Count I to. the extent that it asserted a Fourteenth Amendment, Due Process claim, against the defendants. In that same order, the court denied the defendants' motion to dismiss Counts II and III, or in the alternative, motion for a more definite statement. *See Sevier v. City of Lawrence*, No. 92–4261–SAC, 1993 WL 192836, 1993 U.S.Dist. LEXIS 8149 (D.Kan. May 28, 1993).

2. In *Canton v. Harris*, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989), the Supreme Court held that claims alleging that the municipality's failure to provide training to its employees resulting in the constitutional deprivation suffered by the plaintiff are cognizable under § 1983, but there can only be "liability against a

municipality where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants." *Id.* at 392, 109 S.Ct. at 1206.

3. In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality can only be held liable under § 1983 when the violation of the plaintiff's constitutional rights resulted from a municipal custom or policy.

4. According to the plaintiffs, however, they are dismissing George T. Wheeler as a defendant. Based upon this concession, the court will not address any of the defendants' arguments that Wheeler is entitled to summary judgment.

absence of a genuine issue of material fact given the relevant substantive law." *Thomas v. Wichita Coca–Cola Bottling Co.,* 968 F.2d 1022, 1024 (10th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). "A movant is not required to provide evidence negating an opponent's claim." *Committee for First Amendment v. Campbell,* 962 F.2d 1517, 1521 (10th Cir.1992) (citation omitted).

If the moving party meets its burden, then it becomes the nonmoving party's burden to show the existence of a genuine issue of material fact. *Bacchus Industries, Inc. v. Arvin Industries, Inc.,* 939 F.2d 887, 891 (10th Cir.1991); *see Martin v. Nannie and the Newborns, Inc.,* 3 F.3d 1410, 1414 (10th Cir.1993) ("If the moving party meets this burden, the non-moving party then has the burden to come forward with specific facts showing that there is a genuine issue for trial as to elements essential to the non-moving party's case."). When the nonmoving party will have the burden of proof at trial, "Rule 56(e) ... [then] requires the nonmoving party to go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Mares v. ConAgra Poultry Co., Inc.,* 971 F.2d 492, 494 (10th Cir.1992) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." *Phillips v. Calhoun,* 956 F.2d 949, 951 (10th Cir.1992) (citations omitted); *see Martin,* 3 F.3d at 1414 (non-moving party cannot rest on the mere allegations in the pleadings); *see also Vega v. Kodak Caribbean, Ltd.* 3 F.3d 476, 479 (1st Cir.1993) ("Optimistic conjecture, unbridled speculation, or hopeful surmise will not suffice."). The court views the evidence of record and draws inferences from it in the light most favorable to the nonmoving party. *Burnette v. Dow Chemical Co.,* 849 F.2d at 1273.

More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination. of every action.' Fed.R.Civ.P. 1." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). At the same time, a summary judgment motion is not the chance for a court to act as the jury and determine witness credibility, weigh the evidence, or decide upon competing inferences. *Windon Third Oil and Gas v. Federal Deposit Ins.,* 805 F.2d 342, 346 (10th Cir.1986), *cert. denied,* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987).

## Facts

Willie Sevier and Orene Sevier are the surviving parents and heirs-at-law of Gregory Sevier, deceased. Willie Sevier is the administrator of the estate of Gregory Sevier. Plaintiffs bring this action individually and Willie Sevier brings this action as administrator of his son's estate. The plaintiffs are Native Americans, as was Gregory Sevier.

The City of Lawrence, Kansas, is a municipal corporation duly organized and existing under the laws of the State of Kansas. Ted J. Bordman is a police officer employed by the City of Lawrence. Bordman has been employed in that capacity since January 1, 1989. James H. Phillips is a police officer employed by the City of Lawrence. Phillips has been employed in that capacity since July 11, 1977. George T. Wheeler is a police officer employed by the City of Lawrence. Wheeler has been employed as a police officer since 1978. At the times relevant to this action, Wheeler was a supervisory officer with the City of Lawrence's police force.

W. Ronald Olin is the Chief of Police for the City of Lawrence. Olin has been employed as a law enforcement officer since November 1, 1971. Olin has been employed in the capacity of Chief of Police since December 1, 1987.

### The Events of April 20–21, 1993

Between the hours of 11:00 p.m. and 12:00 a.m. on April 20, 1991, Willie Sevier and Gregory Sevier went to shoot pool at the West Coast Saloon. En route, Gregory Sevier told his father that he was having problems with his girlfriend. While at the West Coast Saloon, Willie Sevier purchased one

pitcher of beer and Gregory Sevier consumed at least one glass of beer.

After making several stops, Willie Sevier and Gregory Sevier returned home. Gregory Sevier went to his room and began playing his stereo at a high volume. He went downstairs and retrieved a six pack of beer. After retrieving the beer, Gregory Sevier returned to his room. Meanwhile, Willie Sevier had gone to bed. After lying down for approximately fifteen or twenty minutes, Willie Sevier arose to tell his son to decrease the volume of his stereo. Willie Sevier knocked on his son's bedroom door to ask him to turn down the loud music. Gregory Sevier did not answer the door and did not respond to his father's voice. Willie Sevier retrieved a plastic toothpick from the kitchen and used it to unlock his son's door.

When he opened the door, Willie Sevier saw his son sitting on the edge of his bed with a knife in his right hand. Gregory Sevier's hand and knife rested on his lap. As Willie Sevier closed the door, Gregory Sevier stood, still holding the knife in his right hand. Willie Sevier closed the door without speaking to his son.

After pacing several minutes outside to determine what he should do, Willie Sevier went downstairs to where his wife, Orene Sevier, was sewing. He told her what he had just witnessed in their son's bedroom. Concerned for their son's safety, plaintiffs decided that it would be appropriate to dial 911 for help. On April 21, 1991, at 2:27:50 a.m., Orene Sevier placed a call to 911. The call transpired as follows:

Emergency Dispatch.

Yes, this is Mrs. Sevier. Could you have an officer come out to my place?

Where is that?

1627 East 18th Terrace.

And for what reason.

My son is in his bedroom and he's having a real problem, and my husband seen him with a butcher knife in there and I just want someone to go in and check him out.

Okay, is your husband there now?

Yeah, he's just standing outside waiting.

How do you spell you last name?

SEVIER

And how old is your son?

He's 22.

.      .      .      .      .

Okay. 1627 East 18th Terrace?

Uh-huh. And don't use the siren or anything. I don't want to alarm him or anything like that. I just want someone to come out here and—

Okay, have you been arguing tonight?

No, no, no, nothing's going on.

Okay, why does he have the knife, do you know?

I think he's having a problem with his girlfriend or something, I think they broke up or something, I don't know.

All right, I'll send someone out.

Thank you.

The call ended at 02:28:57 a.m.

Pursuant to Orene Sevier's call, defendant police officers Bordman and Phillips were dispatched to the Sevier home. The radio dispatch transpired as follows:

Be en route 1627 East 18th Street Terrace . . . the mother advising her 22 year old son is in his bedroom. He has a butcher knife. It's unknown exactly what the problem is. She believes he may be having trouble with his girlfriend, there has been no arguing at the residence. She'd like an officer en route to talk to him.

When he received the dispatch, Bordman did not understand it to be a suicide call. While he recognized that there was a potential for harm due to the presence of the knife, "his main thought process" was that someone was upset "about his girlfriend and that he needed somebody to talk to."

Wheeler, who overheard the dispatch and later responded to the call, also did not understand the call to be a suicide-related emergency. Phillips, who also heard and responded to the call, cannot remember whether or not he assumed, at the time, that the dispatch described a suicide-related emergency. On the way to the plaintiffs' house, Phillips stopped a black pick-up truck for a traffic infraction.

At 02:34:57 a.m., Bordman arrived at the Sevier house. Willie Sevier was waiting outside the house. Bordman immediately entered the plaintiffs' home. Willie Sevier informed Bordman where his son's bedroom was located and that he believed that his son was in the room with a knife. Bordman proceeded to Gregory Sevier's bedroom. Bordman attempted to enter the room, but the door was locked. Loud music emanated from Gregory Sevier's room.

Willie Sevier showed Bordman how to unlock the door with a toothpick. Before unlocking the door, Bordman called and asked that the radio airwaves be cleared except for emergency traffic. Bordman then unlocked the door and opened it about four to six inches. Due to the loud music, Bordman's efforts to communicate with Gregory Sevier were hampered. Phillips arrived at the scene at 02:36:33, shortly after Bordman had opened the bedroom door.

Bordman warned Phillips that he thought the person in the bedroom had a knife. Due to the loud music, Phillips was unable to hear Bordman. Bordman repeated the same warning; in response, Phillips drew his weapon. At some point, Bordman also drew his weapon. Peering into the bedroom through the slight opening of the door, Bordman and Phillips could only see the left half of Gregory Sevier's upright body. Bordman suspected that Gregory Sevier was hiding something because he was reluctant to come into full view. Bordman yelled at Gregory Sevier to show his hands.

At this point Phillips backed down the hallway away from the door to create time and distance from the door where Gregory Sevier was standing—possibly with a knife. At some point, Gregory Sevier emerged from his bedroom and stood in the doorway. Phillips moved hurriedly into the bedroom directly south of and across from Gregory Sevier's bedroom. Gregory Sevier positioned himself at a forty-five degree angle between Bordman and Phillips. As he stood in the hallway, Gregory Sevier clasped the butcher knife in his right hand.

Both Bordman and Phillips repeatedly ordered Gregory Sevier to drop the knife. Bordman also told Gregory Sevier that they were not going to hurt him. As Bordman and Phillips were demanding Gregory Sevier to drop the knife, Wheeler arrived. Wheeler took a position behind Phillips.

At this point, Gregory Sevier cried, "I love you, Mom. I love you, Mom." From the opposite end of the hallway, Orene Sevier responded, "I love you, Gregg." According to each of the officers, Gregory Sevier then turned to his left and lunged at Bordman.[5] Bordman and Phillips fired at Gregory Sevier, striking him six times. According to the plaintiffs' "expert," two of the bullets fired by Bordman passed from back to front. According to the report of the Douglas County Medical Examiner, two of the gunshot wounds to the heart would have been fatal within seconds.

Gregory Sevier fell forward into the bedroom occupied by Bordman. Only Gregory Sevier's feet remained in the hall. Wheeler radioed that shots had been fired, that a man was down, and that an ambulance was needed. As Bordman and Phillips attended to Gregory Sevier, Wheeler restrained Willie and Orene Sevier from reaching their stricken son. From the time that Bordman arrived at the Sevier home until Wheeler reported shots being fired, only four minutes twenty-one seconds elapsed.

### 42 U.S.C. § 1983

■ 42 U.S.C. § 1983 provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

---

**5.** The plaintiffs dispute this fact, contending that the facts demonstrate that Gregory Sevier did not lunge at Bordman.

Section 1983 does not create any substantive rights. *Dixon v. City of Lawton, Okl.,* 898 F.2d 1443, 1447 (10th Cir.1990). A § 1983 claim generally describes a substantive violation of a right secured by the Constitution or law. *Id.*

■■■ Under 42 U.S.C. § 1983, the plaintiff must establish (1) that the actions complained of were done by a person acting under color of state law, and (2) that these actions deprived the plaintiffs of rights, privileges or immunities secured by the Constitution or laws of the United States. *Greco v. Guss,* 775 F.2d 161, 164 (7th Cir.1985); *see Ruark v. Solano,* 928 F.2d 947, 949 (10th Cir.1991); *Dixon,* 898 F.2d at 1447. Whether a person is subject to a § 1983 suit turns upon the ultimate question of whether the alleged infringement of federal rights is fairly attributable to the state. *Rendell–Baker v. Kohn,* 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982); *Tarabishi v. McAlester Regional Hosp.,* 827 F.2d 648, 651 (10th Cir.1987), *cert. denied,* — U.S. ——, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992).

### Qualified Immunity

"The defense of qualified immunity is designed not only to shield public officials from liability, but also to ensure that erroneous suits does not even go to trial." *Hinton v. City of Elwood, Kan.,* 997 F.2d 774, 779 (10th Cir.1993). "This prophylactic protection is afforded our governmental officials on the grounds 'that they can act without fear of harassing litigation only if they reasonably can anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated.'" *Beard, III, v. The City of Northglenn,* No. 93–1068, 24 F.3d 110, 113, 1994 U.S.App. LEXIS 10560, at *8 (10th Cir. May 11, 1994) (quoting *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 3014, 82 L.Ed.2d 139 (1984)). "The presence or absence of qualified immunity is a question of law." *Langley v. Adams County, Colo.,* 987 F.2d 1473, 1476 (10th Cir. 1993).

As our jurisprudence makes clear, when a defendant raises qualified immunity, the burden shifts to the plaintiff to establish the defendant violated clearly established constitutional rights. *City of Lakewood v. Hannula,* 907 F.2d 129, 130–31 (10th Cir. 1990). Further, the Supreme Court mandates a plaintiff do more than simply allege abstract violations. Instead, a plaintiff is charged with making a particularized showing: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 640, 97 L.Ed.2d 523, 107 S.Ct. 3034 (1987). Finally, a plaintiff has to "demonstrate a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Hannula,* 907 F.2d at 131.

As the Supreme Court articulated, this analysis "permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 1793, 114 L.Ed.2d 277 (1991). Once the plaintiff satisfies his burden, the defendant must then show "no material issues of fact remain as to whether the defendant's actions were objectively reasonable in light of the law and the information the defendant possessed at the time of his actions." *Salmon v. Schwarz,* 948 F.2d 1131, 1136 (10th Cir. 1991) (citations omitted).

*Guffey v. Wyatt,* 18 F.3d 869, 871 (10th Cir. 1994).

### Excessive Force Claims

In *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989), the Supreme Court held that "*all* claims that law enforcement officers have used excessive force-deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."[6] *See Austin v.*

---

6. The Fourth Amendment to the Constitution is applicable to the states through the Fourteenth Amendment. *Mapp v. Ohio,* 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).

*Hamilton,* 945 F.2d 1155, 1158 (10th Cir. 1991) ("As a general matter, claims based on the use of excessive force during *arrest* are now governed by the objective reasonableness standard of the fourth amendment."); *Swanson v. Fields,* 814 F.Supp. 1007, 1016 (D.Kan.), *aff'd,* 13 F.3d 407 (10th Cir.1993). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of ' " 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' " ' against the countervailing governmental interests at stake." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872 (quoting *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 1699–1700, 85 L.Ed.2d 1 (1968)) (quoting *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983)).

▇ "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396, 109 S.Ct. at 1872. A police officer may even use deadly force in those situations where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others. *Tennessee v. Garner,* 471 U.S. at 11, 105 S.Ct. at 1701.

> Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," *Bell v. Wolfish,* 441 U.S. 520, 559 [99 S.Ct. 1861, 1884, 60 L.Ed.2d 447] (1979), however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. *See Tennessee v. Garner,* 471 U.S. at 8–9 [105 S.Ct. at 1699–1700] (the question is "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure").

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation. *See Scott v. United States,* 436 U.S. 128, 137–139 [98 S.Ct. 1717, 1723–1724, 56 L.Ed.2d 168] (1978); *see also Terry v. Ohio, supra,* [392 U.S. 1] at 21 [88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968) ] (in analyzing the reasonableness of a particular search or seizure, "it is imperative that the facts be judged against an objective standard"). An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham,* 490 U.S. at 396–397, 109 S.Ct. at 1872; *see Pride v. Does,* 997 F.2d 712, 716–717 (10th Cir.1993); *Swanson,* 814 F.Supp. at 1016–1017.

### Analysis

▇ Although Bordman and Phillips have posited a version of the facts under which their use of lethal force would have been reasonable, the plaintiffs have presented sufficient facts to demonstrate that summary judgment is not appropriate. Viewing the evidence submitted in the light most favorable to the plaintiffs, a rational factfinder could find that the officers' use of force was excessive. Although the defendants argue that the plaintiffs' version of the facts is improbable, the plaintiffs' version of the facts does not appear to be physically impossible. Moreover, in their reply brief, the defendants essentially ask the court to engage in speculation as to the likely movement of Gregory

Sevier's body following the impact of the gunshots. This request places the court in the position of factfinder. Obviously, it is not appropriate for the court to sit as the trier of fact in deciding whether summary judgment should be granted. Consequently, summary judgment must be denied.

In sum, the court finds that the plaintiffs have submitted, albeit narrowly, sufficient facts to demonstrate that genuine issues of material fact preclude summary judgment on their excessive force claims against Bordman and Phillips.

### Equal Protection Claims

■ In their complaint, the plaintiffs allege that Bordman and Phillips deprived them of their Fourteenth Amendment right to equal protection of the law in violation of 42 U.S.C. § 1983. Specifically, the plaintiffs claim that if they had been white, rather than Native Americans, the officers would have treated them differently, thereby avoiding the confrontation between the officers and Willie Sevier.

Each of the officers deny the plaintiffs' allegations of race discrimination and argue that the plaintiffs' conclusory allegations are insufficient to withstand their motion for summary judgment on these claims. The officers contend that there is no evidence to support the plaintiffs' claims.

In their reply brief, the plaintiffs concede that there is insufficient evidence of discrimination against Phillips. The plaintiffs, however, contest Bordman's motion for summary judgment. The plaintiffs contend because Bordman did not follow standard police procedure to gather information concerning the subject of the call for assistance, and because Bordman ignored all opportunities for assistance from the Sevier family, "the only reasonable explanation for his ignoring the Sevier family was their Indian ancestry."

"Although there is no general constitutional right to police protection, the state may not discriminate in providing such protection." *Watson v. City of Kansas City, Kan.,* 857 F.2d 690, 694 (10th Cir.1988).

A plaintiff in an equal protection action has the burden of demonstrating discriminatory intent. *Village of Arlington Heights v. Metropolitan Housing Dev. Corp.,* 429 U.S. 252, 265, 50 L.Ed.2d 450, 97 S.Ct. 555 [563] (1977); *Washington v. Davis,* 426 U.S. 229, 241–42, 48 L.Ed.2d 597, 96 S.Ct. 2040 [2048–49] (1976). It is not necessary to demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was a motivating factor. *Village of Arlington Heights,* 429 U.S. at 265, 97 S.Ct. at 563 (discussing *Washington v. Davis*).

*Watson,* 857 F.2d at 694.

As Bordman suggests, there is insufficient evidence of race discrimination to withstand his motion for summary judgment on the plaintiffs' equal protection claims. The plaintiffs' unsupported, conclusory allegations do not demonstrate that a genuine issue of material fact exists. *See Watson,* 857 F.2d at 694.

All of the defendants are granted summary judgment on the plaintiffs' equal protection claims. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986).

### Municipal Liability

■ The Tenth Circuit has recently summarized the law concerning municipality liability under § 1983:

A municipality may not be held liable under § 1983 solely because its employees inflicted injury on the plaintiff. *Monell v. New York City Dep't of Social Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, [2037] 56 L.Ed.2d 611 (1978). Rather, to establish municipal liability, a plaintiff must show 1) the existence of a municipal policy or custom, and 2) that there is a direct casual link between the policy or custom and the injury alleged. *City of Canton v. Harris,* 489 U.S. 378, 385, 103 L.Ed.2d 412, 109 S.Ct. 1197 [1203] (1989). When the asserted policy consists of the failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of " ' 'deliberate indifference' to the rights of its inhabitants." *Id.* at 389 [109 S.Ct. at 1205].

The district court granted summary judgment to Hinton on the ground that the city's failure to train its officers or adopt

written policies was not the result of deliberate indifference. Given our conclusion that Myer and White's conduct was not constitutionally excessive, however, we do not need to reach the issue of whether the city acted with deliberate indifference.

A municipality may not be held liable where there was no underlying constitutional violation by any of its officers. *City of Los Angeles v. Heller*, 475 U.S. 796, 799, 89 L.Ed.2d 806, 106 S.Ct. 1571 [1573] (1986); *Apodaca v. Rio Arriba County Sheriff's Dept.*, 905 F.2d 1445, 1447–48 (10th Cir.1990); *Watson v. City of Kansas City*, 857 F.2d 690, 697 (10th Cir.1988). In *Heller*, for example, the Supreme Court held that a jury verdict acquitting a Los Angeles police officer of a charge of excessive force precluded the imposition of liability on the City of Los Angeles for adopting a policy condoning the use of excessive force. The Court reasoned that where a municipality is "sued only because [it was] thought legally responsible" for the actions of its officers, it is "inconceivable" to hold the municipality liable if its officers inflict no constitutional harm, regardless of whether the municipality's policies might have "authorized" such harm. *Heller*, 475 U.S. at 799 [109 S.Ct. at 1573].

As in *Heller*, Hinton's excessive force claim against the City of Elwood seeks to hold the city liable solely because of the actions of its individual officers. Our finding that Myer and White's conduct did not violate Hinton's Fourth Amendment rights, therefore, precludes the imposition of any liability against the City of Elwood. Accordingly, we conclude that the district court properly granted summary judgment in favor of the municipality.

This conclusion is not inconsistent with our statement in prior cases that a finding of qualified immunity does not shelter a municipality from liability. *See, e.g., Medina v. City and County of Denver*, 960 F.2d 1493, 1499–1500 (10th Cir.1992); *Watson*, 857 F.2d at 697. In *Medina* we determined that the individual defendants were entitled to qualified immunity because the law was not clearly established, 960 F.2d at 1498–99, and in *Watson* we remanded for a finding on that issue, 857 F.2d at 697.

When a finding of qualified immunity is predicated on the basis that the law is not clearly established, it is indeed correct that "there is nothing anomalous about allowing [a suit against a municipality] to proceed when immunity shields the individual defendants, for the availability of qualified immunity does not depend on whether a constitutional violation has occurred." *Watson*, 857 F.2d at 697.

An individual municipal officer may also be entitled to qualified immunity, however, because the officer's conduct did not violate the law. When a finding of qualified immunity is predicated on this latter basis, such a finding is equivalent to a decision on the merits of the plaintiff's claim. *See Siegert*, [500 U.S. at 231–32] 111 S.Ct. at 1793–94. In such a case, a finding of qualified immunity may preclude the imposition of any municipal liability. In the instant case, our finding of qualified immunity was predicated on this latter basis. Accordingly, we may properly rely on this finding to dismiss Hinton's claims against the City of Elwood.

*Hinton*, 997 F.2d at 782–783.

### Analysis

The court, having carefully reviewed the exhibits submitted, concludes that the City of Lawrence and Olin are entitled to summary judgment on the plaintiffs' equal protection claims, excessive force claims, and inadequate training claims. Based upon the uncontroverted facts, the plaintiffs have not demonstrated that any policy or custom existed that encouraged the discrimination against Native Americans, nor have they demonstrated the existence of a policy or custom condoning or encouraging the use of excessive force. *See Butler v. City of Norman*, 992 F.2d 1053, 1055–1056 (10th Cir. 1993).

Similarly, the plaintiffs have failed to demonstrate that the defendants had a policy or custom to inadequately train their police officers or that such a policy or custom, if one so existed, amounts to a deliberate indifference to city's inhabitants. Moreover, the plaintiffs have failed to demonstrate that there is a

direct casual link between the alleged policy or custom and the injury suffered.

## Supplemental Claims

In light of the court's conclusion that Bordman and Phillips are not entitled to summary judgment on the plaintiffs' excessive force claims, the court will consider whether the defendants are entitled to summary judgment on the plaintiffs' supplemental claims.

## Wrongful Death

■  The defendants contend that the discretionary function exception to the Kansas Tort Claims Act, K.S.A. 75–6101, *et seq.*, shields them from liability on the plaintiffs' wrongful death claims. In response, the plaintiffs argue that this defense should be dismissed on procedural grounds as the defendants' request for leave to file an amended answer asserting immunity under the Kansas Tort Claims Act had not yet been granted.[7] In the alternative, the plaintiffs contend that the Kansas Tort Claims Act does not provide any of the defendants with immunity from their excessive force claims.

In their reply brief, the defendants concede that the Kansas Tort Claims Act would not shield them from liability to the extent that their use of force was excessive. *See Caplinger v. Carter*, 9 Kan.App.2d 287, 676 P.2d 1300 (1984). The defendants, nevertheless, contend that they are entitled to summary judgment on the plaintiffs' wrongful death claims to the extent that they are predicated on a theory of negligence.

Based upon the evidence presented, the defendants are entitled to summary judgment on the plaintiffs' wrongful death claims to the extent that they are predicated on a negligence theory. *See* K.S.A. 1993 Supp. 75–6104(e).

The plaintiffs contend that Bordman was not exercising discretion on April 21, 1991, but instead was required under the City of Lawrence's policy to call out the Crisis Response Team. The plaintiffs argue that the discretionary function exception does not apply. *See Nero v. Kansas State University*, 253 Kan. 567, 585, 861 P.2d 768 (1993) ("If

there is a clearly defined mandatory duty or guideline, the discretionary function exception is not applicable."). In this case, the plaintiffs have failed to demonstrate that such a clearly defined policy governed the officers' actions in this case. Although the City of Lawrence has a policy for handling barricaded subjects, the officers reasonably concluded that Gregory Sevier was not barricaded, and therefore the defendants are entitled to the protection afforded them by the discretionary function of the Kansas Tort Claims Act on the plaintiffs' negligence claims.

## Tort of Outrage

■  The defendants essentially argue that because they are entitled to summary judgment on the plaintiffs' excessive force claims, they are equally entitled to summary judgment on the plaintiffs' claims based upon the tort of outrage. The plaintiffs respond, arguing that because their excessive force claims cannot be decided in this motion for summary judgment, the court should deny the defendants' motion.

Although the defendants generally discuss the elements of the tort of outrage, the defendants' primary emphasis centers on the fact that they are entitled to summary judgment on the plaintiffs' excessive force claims. Based upon the arguments presented by the defendants and upon the court's conclusion that the defendants are not entitled to summary judgment on the plaintiffs' excessive force claims, the court denies the defendants' motion for summary judgment on the plaintiffs' claim for the tort of outrage.

IT IS THEREFORE ORDERED that the defendants' motion for summary judgment (Dk. 60) is granted in part and denied in part as set forth in the body of this opinion.

IT IS FURTHER ORDERED that the defendant, George T. Wheeler is granted summary judgment.

---

**7.** On April 6, 1994, the magistrate judge granted the defendants' motion to include the defense of immunity under the Kansas Tort Claims Act as related to the plaintiffs state law claims. *See* (Dk. 75).