**Roy SMITH, Plaintiff,**

**v.**

**GILPIN COUNTY, COLORADO, et al., Defendants.**

Civil Action No. 94–D–779.

United States District Court, D. Colorado.

Dec. 24, 1996.

William S. Finger, Frank & Finger, Evergreen, Co., John R. Holland, Denver, CO. Steve A. Miller, Steve A. Miller, P.C., Denver, CO, for plaintiff Roy Smith.

Frederick A. Fendel, III, Donna A. Worley, James Joseph Petrock, Petrock & Fendel, P.C., Denver, CO, for defendants Gilpin County Board of County Commissioners, Gilpin County Sheriff's Department, Bruce Hartman, in His Official Capacity as Sheriff for the County of Gilipin, John Bayne, Kent Edlund, Mike Lacosse, and John Does 1–5 (persons whose identities are unknown).

Telfer W. Norman, Norman & Mirabella, Lakewood, CO, Alan Peter Gregory, James Barry Powers, Harris, Karstaedt, Jamison & Powers, P.C., Englewood, CO, Michael S. Porter, Michael S. Porter Law Firm, Wheat Ridge, CO, for defendant Bob Berube.

James Joseph Petrock, Petrock & Fendel, P.C., Denver, CO, for defendant Rosetta Anderle.

## MEMORANDUM OPINION AND ORDER

DANIEL, District Judge.

### I. *INTRODUCTION*

THIS MATTER is before the Court on the Governmental Defendants' motion to dismiss or for summary judgment filed August 24, 1994 and their renewed motion filed June 18, 1996.[1] In arriving at my decision, I have carefully considered Plaintiff's recent supplemental factual submission which urges the Court to reject as unfounded Defendants' defense of qualified immunity. In response to Defendants' contention that the individual defendants are entitled to qualified immunity as a matter of law, Smith, with powerful and persuasive facts, shows why qualified immunity is unavailable to these Defendants.

Through his complaints, Plaintiff Roy Smith ("Smith") alleges substantial violations of his civil rights. Smith's second and third amended complaints allege that he has been the subject of a series of racially motivated crimes. Defendant Robert Berube ("Berube") is the alleged perpetrator of these acts. Smith further claims that there was a racially based refusal on the part of the Defendant officials to whom the crimes were reported to enforce the laws and protect Smith as required by the equal protection clause of the Fourteenth Amendment. As a result, Smith claims that he has been literally driven out of his home and off his land in Gilpin County.

Smith asserts claims for violations of 42 U.S.C. §§ 1981, 1982, 1983, and 1985(3). Smith claims Berube, a private citizen who lived next door to him, violated his civil rights, under the same statutes, and is also liable under theories of negligence and negligence *per se.* Smith seeks compensatory and punitive damages, injunctive and declaratory relief, fees and costs.

The Defendants asserted qualified immunity in their motion to dismiss and/or for summary judgment. Defendants further asserted that there is no constitutional protection from the consequences of unlawful acts by third parties and no constitutional right to have all complaints investigated and/or arrests made. At a hearing held on May 24, 1996, I ruled that violations of clearly established law had occurred as to the Defendants as a group and I ordered limited discovery as to the qualified immunity issues. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Siegert v. Gilley,* 500 U.S. 226, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991); *Workman v. Jordan,* 958 F.2d 332, 336 (10th Cir.1992).

---

1. The Court's use of the word "Defendants" herein encompasses only those Defendants which have asserted the qualified immunity defense. These Defendants are the Gilpin County Sheriff's Department ("Sheriff's Department"), Bruce Hartman ("Hartman"), John Bayne ("Bayne"), Kent Edlund ("Edlund"), Mike LaCosse ("LaCosse") and Rosetta Anderle ("Anderle").

■ The clearly established law is that, although there is no general constitutional right to police protection, *DeShaney v. Winnebago County Dep. of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the police may not discriminate in providing such protection. *Watson v. City of Kansas City, KS*, 857 F.2d 690, 694 (10th Cir.1988). Put another way, the state violates the Fourteenth Amendment's equal protection clause if it selectively denies its protective services to disfavored minorities. *DeShaney*, 489 U.S. at 197 n. 3, 109 S.Ct. at 1004 n. 3; *Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Mody v. City of Hoboken*, 758 F.Supp. 1027 (D.N.J. 1991), *aff'd*, 959 F.2d 461 (3rd Cir.1992). Acts of omission are actionable in this context to the same extent as acts of commission. *Smith v. Ross*, 482 F.2d 33 (6th Cir. 1973).

As the Sixth Circuit noted in *Smith*:

particularly in view of the circumstances surrounding the passage of § 1983, including the concern for protecting Negroes from the widespread non-enforcement of state laws [citation omitted], the remedies provided in § 1983 are most appropriately extended to persons who, because of the unpopularity in their life-styles or the pervasiveness of racial animus in the community, are not protected in their attempt to enjoy peacefully and on an equal basis the civil rights guaranteed under the laws.

*Id.* at 36.

Similarly, the court held in *Hawk v. Perillo*, 642 F.Supp. 380 (N.D.Ill.1985) that this type of action or inaction by the police relative to minorities is "precisely the type of actions that motivated Congress to pass Section 1983. 'While one main scourge of the evil—perhaps the leading one—was the Ku Klux Klan, the remedy created was not a remedy against it or its members but against those who representing a State in some capacity were unable or unwilling to enforce a state law.'" *Id.* at 383 (quoting *Monroe v. Pape*, 365 U.S. 167, 175–76, 81 S.Ct. 473, 477–78, 5 L.Ed.2d 492 (1961)).

In ruling that Defendants violated clearly established law, I found that the contours of the right were sufficiently clear that a reasonable official would understand that what he was doing violated that right. *Anderson v. Creighton*, 483 U.S. 635, 646 n. 6, 107 S.Ct. 3034, 3042 n. 6, 97 L.Ed.2d 523 (1987). However, I found that factual issues existed regarding the viability of the qualified immunity defense warranted discovery on this limited issue. Thus, I allowed depositions to go forward as to qualified immunity defense and permitted the filing of supplemental factual position statements by the parties.

## II. FACTUAL BACKGROUND

Smith alleges a series of incidents and assaults against him where he claims, among other things, that he was beaten, bitten by unrestrained dogs, assaulted by a car, and hung upside down from a beam in his house.[2] Smith claims the Defendants' failure to protect him was motivated by racial animus as evidenced by the fact that members of the Sheriff's Department referred to him as "Nigger Roy" or the "town nigger." Defendants concede, for purposes of the motion, that they used the racially derogatory name "Nigger Roy" in reference to Smith. However, they argue that Smith permitted the use of this name. The following is a summary of specific evidence presented by Smith in support of his claims.[3]

### A. Use of the Term "Nigger Roy" and whether it was Sanctioned by Smith

1. Anderle testified in her deposition that she referred to Smith as "Nigger Roy", and

---

2. In support thereof, Smith filed numerous exhibits including, but not limited to, (i) an affidavit attached as Exhibit 21 to Smith's Response to Governmental Defendants' Motion to Dismiss and in the Alternative for Summary Judgment and Request for Relief from Stay of Discovery ("Smith's Response"); (ii) an affidavit of law enforcement officer Robert Dunkley, retained as an expert in this case by Smith, attached as Exhibit 23 to Smith's Response; and (iii) the Evidentiary Submissions and Summaries in Support of Smith's Further Factual Demonstration that Defendants are not Qualifiedly Immune and are not Entitled to Summary Judgment.

3. The list is not meant to be exhaustive as to Smith's evidence but does detail evidence that I find particularly apposite to my ruling. I have divided the evidence into categories for ease of reference.

that Smith was known that way in the community. Anderle also testified that she heard Hartman and Bayne refer to Smith this way about half a dozen times, and that many other people in the office called him this name. Finally, Anderle testified that it was the practice, custom and habit of the office of the Sheriff's Department, Bayne and Hartman to refer to Smith that way. Anderle testified that they called him "Nigger Roy" because Smith referred to himself this way and/or told people to call him that. However, Anderle admitted that Smith never asked her to call him that and that he never referred to himself as that during the six times she talked with him.

2. Bayne testified that he did not recall referring to Smith as "Nigger Roy" but asserted that he heard Anderle call him this. This is in contradiction to Anderle's deposition where she testified that she heard Bayne refer to Smith as "Nigger Roy" on about a half dozen occasions. Bayne further stated in his deposition that he could not think of any reason why Anderle would lie. Further, Bayne testified that neither he nor any of the other sheriffs whom he knew asked Smith's permission to call Smith "Nigger Roy." Finally, Bayne testified that he thought the term "Nigger Roy" was racist and offensive.

3. Hartman testified in his deposition that the words "Nigger Roy" were used in the Sheriff's Department and the entire community from 1983 through at least 1992. Hartman testified that he heard Anderle refer to Smith as "Nigger Roy" and that the department, under his jurisdiction and authority, still maintains Smith's nickname in the computer file as "Nigger Roy." Hartman, however, denied referring to Smith as "Nigger Roy." This testimony is in contradiction to Anderle's deposition where she testified that she heard Hartman refer to Smith as "Nigger Roy" on about a half dozen occasions. Hartman further testified that he thought the term "Nigger Roy" is an ugly racial description and was offensive. Finally, Hartman testified that Smith never introduced himself to Hartman as "Nigger Roy."

4. Edlund testified in his deposition that it could have been him who told Trooper Kemper that Roy Smith was known as "Nigger Roy." If it was not him, someone else from the Department made the communication to Trooper Kemper. Irrespective of the identify of the officer who made the statement it was made in his or her official capacity as a member of the Sheriff's Department. Edlund further testified that he knew this was Smith's nickname, and that this nickname was given to Trooper Kemper so he could identify Smith to people in the town who did not know Smith's given name. Edlund also testified that he had no recollection of Smith calling himself "Nigger Roy." Finally, Edlund testified in his deposition that Smith was the only person for whom the Sheriff's Department used a racist nickname in their computer.

5. Before their depositions, Defendants Anderle, Hartman, Bayne, Edlund and La-Cosse stated in their answers to interrogatories dated June 5, 1996 and August 12, 1996 that "Roy Smith has never been called or known by the Sheriff's Department as 'Nigger Roy,'" and that the only official report referring to him as that called for known nicknames. Also, Defendants admitted in their interrogatory responses that in all their numerous contacts with Smith, they never heard Smith refer to himself as "Nigger Roy."

6. Berube and his wife admitted in their depositions that Smith does not refer to himself as "Nigger Roy." Affidavits of Bill Ward and James Hutchison ("Hutchison") state that Smith never described himself this way and is offended by the term.

7. Smith testified that he never referred to himself this way, denies that he asked anyone to call him "Nigger Roy," and testified that he found this very offensive. Further, Smith maintains that anyone who states otherwise on behalf of the Defendants is lying or has confused his knowledge of the use of the term with an endorsement of it.

8. Further, there is evidence that the Sheriff's Department knew that Smith objected to being called a "nigger." Bayne admitted in his deposition that Smith was concerned about being called a "nigger." Smith complained about being called a "nigger" in connection with the August 3, 1992

car attack. Further, Smith testified that he told Anderle not to call him a "nigger" and she promised she would stop. However, the computer notation about Smith being called "Nigger Roy", entered after this conversation with Anderle, shows that the Sheriff's Department did not stop referring to him this way.

9. Defendants stated in an interrogatory response that the only person in the Sheriff's Department who heard Roy Smith describe himself as "Nigger Roy" was Ann Collopy. In an affidavit dated in May, 1996, Ms. Collopy stated that she once called Smith "Nigger Roy" to which he responded, "It's ok to call me that, everyone does," and that he didn't have a problem with that. However, Ms. Collopy testified in her deposition taken in September, 1996, that Smith never referred to himself this way in discussions with her.

10. After Defendants stated in their interrogatory response that the only person in the Sheriff's Department who heard Smith describe himself as "Nigger Roy" was Ann Collopy, Defendants later submitted affidavits of Deputy Forristal and the former Sheriff dispatcher, Dixie Lovingier, which stated, contrary to the interrogatory response, that Smith introduced himself or referred to himself as "Nigger Roy" to them.

11. None of the Defendants has taken any steps to cause the removal of the term "Nigger Roy" from the Sheriff Department's computer. This is despite the fact that Bayne testified that it probably would be best to take it out because the term is improper and wrong.

12. In addition to referring to Smith as "Nigger Roy" in contacts with Trooper Kemper, Trooper Kemper wrote down that either Hartman or Edlund told him that Smith was just the "town nigger". He said he was shocked by this comment. Both Edlund and Hartman deny telling Trooper Kemper that Smith was the "town nigger."

### B. *Unfounding of Smith's Claims*

13. It is undisputed that Smith complained on numerous occasions about crimes committed against him. In fact, the parties stipulated that there is a letter on file in the Sheriff's Department, dated January 1990, where Smith asks for protection.

14. Trooper Kemper stated that he was told by either Hartman or Edlund that Smith's complaints were usually unfounded. It is undisputed that Hartman, Edlund and/or Bayne told Kemper that they had found little substantive evidence to back up Smith's claims. This statement was made despite the fact that Smith's injuries were documented by medical records, Smith often identified potential suspects, and there was clear evidence in at least one of the assaults, the vehicular assault.

15. Anderle admits that as far as she can see, Defendants failed to investigate the four assault cases Smith brought to the Department's attention in October 1989, January 1990, April 1990 and March 26, 1991, including an incident where Smith was hit with a baseball bat and called "nigger." Further, there was no follow-up done, other than just documenting that a crime occurred. Further, Anderle admits that the Department did not issue an all points bulletin for the cars described or the people involved and did not do a lineup although Smith gave them good investigative leads and had documented injuries. Anderle also admits that all points bulletins were put out in other assault cases involving white persons. Finally, she testified that Smith gave them information in all four cases which could provide the basis for a probable cause arrest if they worked on it.

16. Further, there was no investigation of these incidents despite the fact that Anderle testified that she found Smith to be truthful in her contacts with him, that he always had injuries, that he always gave her the best information he could, that she never thought he was crazy or organically imbalanced in the brain, and that she had no reason to think Smith was making anything up.

17. However, contrary to Anderle's deposition testimony, the Columbine medical records where Smith was treated for his injuries contain an entry that says Anderle suggested to them on March 26, 1991 that Smith might be confabulating his incidents.

18. Further, Dan Wall, a neighbor of Smith's, stated in his affidavit that he had a

conversation with a deputy Sheriff Tim Cates who told him that there "were a lot of hard feelings in the Sheriff's Department towards Smith because [he] was always complaining that people were injuring him", that Sheriff Anderle "had a real bad attitude about Roy Smith," and said "she had no use for Roy" and didn't "care for Roy." Wall also stated that Anderle told Cates that Anderle "had no intent of helping [Roy]" and "could care less what happened to him." Finally, Wall stated that Cates told him that Anderle said "she wasn't going to do anything about his complaints about being attacked" and that she and the Department were just "gaffing [Smith's complaints] off."

19. Finally, many of Smith's claims were declared unfounded despite some or all of the Defendants knowing that there was a dispute between Berube and Smith regarding wages. Further, Berube stated on Channel 9 news that he wanted Smith's land. It was also reported to Deputy Cates by Smith that the Berubes yelled and shouted at Smith, verbally attacked him, told him they didn't like him as a neighbor and that they didn't want him there. Cates did not make a report about what Smith told him although he admits that if Smith was the subject of a campaign of acts against him by Berube that it would have been an important thing to report. Also, two affiants in this case state that they informed the Sheriff's Department that Berube had described Smith as that "black bastard" and wanted to run him out of the County. Berube now admits telling one of these affiants that he would be better off if Smith wasn't around. Although Berube denies ever calling Smith a "nigger" or using that word, this is contradicted by the deposition testimony of James Lancaster wherein he states that he observed Berube's utter extreme racist statements, including use of the word "nigger," which indicated that he hated black people.

20. It is undisputed that Smith left Gilpin County on August 5, 1993. Smith testified that he concluded that his life was in danger and that the Sheriff's Department and the Defendants would not protect him. Specific incidents of the Defendants' alleged failure to protect him include the following.

*i. Vehicular Assault*

21. Smith testified that LaCosse declared unfounded the August 3, 1992 vehicular assault case wherein Defendant Berube allegedly attacked him with a car and yelled at him: "You niggers are all over the place. You God Damn mother fucking nigger." He testified in his affidavit that he specifically requested LaCosse to protect and document the crime scene evidence but that LaCosse refused to fulfill his law enforcement obligations. Smith further testified in his deposition that it was worth his life to preserve this evidence. Trooper Kemper later documented the tire mark, the striking of the sign behind which Smith was standing, and the racist comments allegedly made in connection with the assault.

22. LaCosse admits investigating the vehicular assault. He admits that he was told by Trooper Kemper that there was a racial epithet component and that he also knew this from Smith. Despite this knowledge, he admits waiting 26 days before interviewing Berube, and that he called Berube in advance which would have allowed him the opportunity to destroy or alter useful evidence. LaCosse further admits that he did nothing to prevent the destruction of evidence from happening, never preserved evidence favoring Smith, that he didn't look for paint on the Berube vehicle, that he didn't look at Kemper's written report, that he couldn't recall if he asked Trooper Kemper what he observed in the investigation, that he did not ask Trooper Kemper about his observations of the red paint on the Berube bumper, that he never asked Berube how the paint got on his bumper, that he is unsure if he asked Berube whether he drove the vehicle on the night in question and that, contrary to his interrogatory response, he did not ask Berube if he hit or made contact with Smith's sign. Instead, he simply unfounded the case based on an alleged lack of evidence.

23. Edlund was the supervisor of the vehicular assault case. Edlund admits that evidence disappeared since Berube was not contacted for 26 days. He further admits this was his fault along with the fault of LaCosse. Edlund testified that, knowing

what he knows now, it is preposterous, or incredible and ridiculous, that they unfounded the case for lack of evidence. Further, he admits that the evidence was there for the taking at the time of the assault. Edlund admits that it is probable he would now charge Berube if the statute of limitations had not run. Finally, Edlund admits that this assault report included a serious allegation of a race hate crime and that one of his duties is to protect minority citizens from race hate crimes. However, despite the racist language "you motherfucking niggers, you are all over the place" and despite the fact that it is the worst racial allegation he ever heard in law enforcement, he states that this crime was not registered as a race hate crime.

24. Edlund also testified that he knew there was an allegation of red paint on the bumper of Berube's car and that he knew that Trooper Kemper thought the red paint on the bumper came from Smith's sign. He admits that he never tried to get any evidence regarding the paint on the bumper to tie Berube to the assault, and that he is disturbed now that they didn't do things differently. Edlund also knew that Trooper Kemper took photos showing the paint but admits that these photos were never blown up so that the paint could be seen. Further, Edlund admits that he and LaCosse made what could be an "incredible mistake" by not asking Berube how he got home that night or whether he drove. At the time the alleged assault occurred, it is undisputed that Berube did not have a license, having lost it for a second DUI, and was serving a 300 plus day suspended jail sentence. None of the Defendants investigated this point, even though Edlund acknowledged in his deposition that this evidence was possibly a "smoking gun." Further, Edlund has admitted that the failure to investigate was "embarrassing" and "far below the standard of care" that should be practiced in law enforcement.

25. Edlund stated in a Channel 9 interview that there was no evidence to support the allegation of vehicular assault although, in hindsight, there was evidence. Edlund admits that he knew, at the time of the interview, that Smith was claiming that the Department failed to protect him and that it used racism as a reason for not enforcing the criminal laws. Further, Edlund told Channel 9 that Smith had some kind of chemical imbalance but admitted in his deposition that he has never seen a chemical study or organic brain test of Smith's brain.

26. Edlund admitted in his deposition that Defendants failed to protect Smith, a minority citizen, from this racial crime. Edlund also admitted that, from the perspective of a citizen and a black man, if somebody assaulted him with a car and called him those names and law enforcement did what happened in this case, he would have to agree that it would look like law enforcement was not very interested in him. Further, he admitted that he understood why Smith thinks he has been the victim of racial discrimination in the law enforcement area because of the unfounding by Edlund of two alleged crimes by Berube. Further, he stated that if he were a black man and the police took a white man's word and didn't look for the paint on a car in a case that was accompanied by racial words, it is conceivable that he might feel like there was prejudice in favor of the white guy and against him.

27. Hartman testified that he was not involved in the investigation of the vehicular assault. However, Berube testified that Hartman was the first one that met with him regarding the assault. Hartman further testified that by the time the Sheriff's Department looked into the possibility of filing criminal charges against Berube, the statute of limitations had run. Hartman then called the FBI to ask them to look into filing federal charges.

28. It is undisputed that the Defendants did not impound Berube's car, failed to obtained a search warrant, and failed to obtain paint samples so that they could definitively confirm the connection. Defendants Edlund and Hartman admit that paint matching tests are definitive and conclusive. It is further undisputed that none of the Defendants talked to witness Danny Wall who heard this attack and observed the track marks and damage to the sign as well as the resulting injuries to Smith. These injuries were later

documented by Trooper Kemper and Dr. Christiansen.

29. Berube has now admitted that he did intentionally hit the signs behind which Smith was standing and that he had red paint from the signs on this bumper. Further, he testified that neither Hartman nor any of the other Defendants ever asked him about whether he hit the sign. In contradiction to this testimony, Defendants stated in an interrogatory response that Berube was asked about his involvement and that he denied hitting the signs. However, Berube testified that Hartman did ask him whether he tried to run over Smith which he denied.

30. Defendants Hartman and Edlund admit that they involved the State Patrol and Trooper Kemper in the vehicular assault case because Smith was unhappy with their handling of his other cases. Trooper Kemper testified that he would have charged the Berubes with a crime if the case had not been taken away from him by the Sheriff's Department.

31. An investigator from the District Attorneys' office, Ray Kechter ("Kechter"), testified in his deposition that he thought the investigation regarding the vehicular assault was not competent law enforcement or investigation.

### ii. *The Hanging*

32. As described in his affidavit, Smith states that he was attacked by several men in his home who dragged him to the middle of his home. They put wire on his lower legs, twisted them and hung him upside down with a rope attached to a beam in his home. They then took a pair of pliers and pulled on his testicles causing his skin to break, resulting in an infection. With respect to this incident, it is undisputed that at least some of the Defendants knew about it and refused to investigate. Hartman admits in his deposition that he learned of the incident from Jim Hutchison, a neighbor of Smith's, when Hartman was investigating an alleged shooting at Smith. Despite that fact and being about one-half mile from Smith's house, Hartman testified that he consciously decided, as the Sheriff of Gilpin County, that he had more pressing business and wouldn't go see Smith

even though he was investigating a case involving him. Further, he did not ask any of his subordinates to go over there because Hutchison assured him that Smith would come to the office to give them details about it. Further, he did not ask the FBI to investigate this crime. Hartman admitted in his deposition that he made no written report about the alleged hanging and that there was no investigation of the hanging. Hartman further admits that the allegation of hanging as described in the court files was revealed in time to give the Sheriff's Department an opportunity to investigate the charge. However, the department made the conscious decision not to investigate. The statute of limitations has now run with respect to this alleged crime.

33. Hutchison stated in his affidavit that he told Hartman about the hanging incident in June of 1993. Hartman told Hutchison that he knew that there was something going on because Berube was trying to scare Roy out of Gilpin County.

34. Hartman admits that when he was told of the hanging incident by Hutchison he also knew that Smith had complained in the recent past of a vehicular assault, which was accompanied by racial slurs. He testified that he would have reason to believe that racial animus existed in conjunction with these two events. He also knew of about five (5) prior instances where Berubes' dogs had bitten Smith. He investigated them himself, and also knew that Smith claimed Berube had not paid him for labor. Finally, Hartman knew that Smith was unhappy with the Department's handling of his complaints but did not talk to Smith about it.

35. District Attorney investigator Kechter also testified that Hartman knew that there was racial motivation associated with the crimes. However, Kechter testified that he was never told about the alleged hanging and that he considered this to be a serious matter for inquiry. Further, he testified that he hoped that if the sheriff had received information about the hanging that he would have investigated it. Finally, Kechter testified that the District Attorneys' office would have helped in the investigation if asked.

36. Bayne testified in his deposition that if there was an allegation that Smith was hung that this would be a serious matter that needed to be looked into, including an investigation of the physical injuries and an interview of the victim.

37. Bayne submitted an affidavit to the court stating that all reports in the Department's possession had been provided. No report was attached regarding the hanging. Then, post litigation and after the affidavit was submitted, a report referencing a beating that might also have related to the hanging was produced that was not previously provided. Smith contends that the numbering sequence and dating is totally inconsistent since the beating and hanging events occurred in October but the report is signed in August of 1992. Edlund said he could not explain this. Smith argues that this report was created after the fact.

38. Dr. Jill Gould swore in her report that ligature scars on Smith's legs appear extremely consistent with a suspension hanging.

### iii. *Shooting Incident*

39. Hartman testified that he made a decision not to cause anyone to investigate a shooting incident wherein Smith claims someone shot at him. Also, no effort was made to find the bullet. Further, although it was clear that Berube was drinking that day and shooting, Hartman did not ask him to perform any sobriety maneuvers or give him a Miranda warning regarding the shooting. Finally, no criminal charges were filed. Hartman just told Berube to exercise more caution when shooting due to possible ricochets.

40. At the time of the shooting incident, Hartman admits that the Sheriff's Department was fully on notice that Smith had been the victim of five (5) separate dog bites involving Berube's dogs and that Smith claimed to have been the victim of a racially motivated vehicular assault which he attributed to Berube. Despite the foregoing, the shooting incident was closed as unfounded.

41. Hutchison testified that the Sheriff's Department did nothing in response to Smith's and Hutchison's calls that Berube was shooting a gun in the direction of Smith's house, and that Hutchison told Hartman that he was fed up with the Sheriff's Department refusal to stop these attacks on Smith.

### iv. *Dog Bites*

42. Defendant Berube and his wife were only charged with petty offenses in connection with the five or six dog bite incidents despite the repeated attacks and the documented injuries to Smith. On the fifth biting, Edlund testified that he had determined to issue a summons because he felt a crime had been committed but that Hartman "took over the investigation" and determined that perhaps Smith had lifted the fence himself and let the dogs bite him. However, Edlund testified that he knew Smith was afraid of Berube's dogs and that it made no sense for him to lift the fence. Edlund further testified that "Hartland took Mr. Berube's belief over Mr. Smith's word." Consequently, no charge was ever filed against Berube.

43. Hartman admitted in his deposition that he never even talked to Smith about the case and that there was no evidence that Smith lifted the fence.

44. Smith denies letting out the dogs to bite him and suggests this is "ridiculous and outrageous." Finally, there is no dispute that Smith actually received dog bites.

45. Smith maintains that white people who had been the subject of dog bites received different treatment than he as documented by several reports and the deposition testimony of certain of the Defendants who admitted to ticketing people for not having their dogs licensed where white people were bitten. Even in a case of a single bite of a white person, the Sheriff's Department has charged crimes under the misdemeanor provision of the relevant statute rather than the petty offense section used in this case. This petty offense section was used despite the fact that Edlund characterized the Berube's dogs a "vicious dogs" by county definition and despite the fact that it is undisputed that Smith received dog bites, including puncture wounds from his feet to his abdomen. Further, no pictures were ever taken of the injuries although the Sheriff's Department

admitted to doing so in other cases, the dogs were never impounded, destroyed or tested for disease, and the Berubes were never even required to license their dogs.

### v.  *Other Incidents*

46.  Bayne unfounded an investigation he was performing of an alleged attack with a baseball bat on Smith.  Bayne testified that this incident was unfounded after the clinic where Smith was seen told him that the injury did not appear to have been caused by a bat.  However, this testimony is inconsistent with the actual medical records of the clinic which indicate that Smith was injured by a baseball bat.

47.  Bayne also unfounded an incident where someone dumped all of Smith's food on the ground and stole some mining equipment.  The Berubes were not contacted and the witnesses who reported the food dumping were not interviewed.  Bayne admit that he could have left this and other investigations regarding Smith open instead of declaring them unfounded.

48.  Bayne now admits that rather than solving Smith's crimes, he doubted they occurred.  He told Hartman and Anderle that he had these doubts as early as 1990.  Further, Edlund and Anderle both admit that in the numerous cases of alleged crimes involving Smith, they could not point to a single case where Roy Smith did not have some injury associated with his complaint.  Hartman could only point to one case of the many involving Smith where he questioned the existence of his injuries.

49.  Deputy Forristal admits in his deposition that he made no report about an attack of Smith by three people with a rake, and that he did not investigate the place where Smith said he was attacked or ask about witnesses.  Forristal testified that he called the Columbine Clinic to determine whether scabs and bumps on Smith's head could have been caused by the rake attack and was told that the injuries were old injuries and not consistent with Smith's description of the attack.  However, this testimony is contradicted by medical records indicating abrasions on Smith's face.

### C.  *Other Evidence*

50.  Plaintiff asserts that evidence in this case has been lost or destroyed.  Hartman testified that he understood the Sheriff's Department took photographs of the food dumping incident but claims they are now lost.  Further, LaCosse took pictures of the pine branch beating of Smith but lost them.  The aluminum bat which Smith claims he was beaten with and which he brought to the Sheriff's Department was never tested for prints or blood and was allegedly given away to a baseball league.

51.  Kechter from the District Attorneys' office provided an affidavit wherein he asserts that, based on his review of the Sheriff's Department records and interviews with the deputies, "Smith was not a victim of any racially motivated attitudes on the part of the Gilpin County Sheriffs which would have resulted in inferior investigations, or outright failure to investigate his complaints, rather I determined that the Gilpin County Sheriffs Department provided exceptional response to Mr. Smith's complaints and that the handling of his complaints exceeded reasonable law-enforcement standards in that jurisdiction. . . ."

52.  This affidavit conflicts with the affidavit of Plaintiff's police expert Dunkley.  Dunkley documented in his affidavit that the Sheriff's Department showed "an inclination to unfound, discount or prejudge Mr. Smith's reports" and that it is his opinion "that Roy Smith has been the victim of hate crimes.  The investigation of these crimes by law enforcement personnel cause me to believe and it is my opinion that Roy Smith has experienced deliberate indifference and racism by law enforcement personnel of the Gilpin County Sheriff's Office."

53.  Moreover, Kechter's affidavit appears to be in conflict with his deposition testimony wherein he stated that he had not studied or seen individual case complaints by Smith apart from some of the materials in the vehicular assault, and admitted in his deposition that the handling of various matters would not meet his standards for proper and competent investigation.  Finally, he admits that he only investigated the references to

"Nigger Roy" instead of the statement the ACLU asked him to look into which was Trooper Kemper's report that Defendants referred to Smith as the "Town Nigger."

## III. *ANALYSIS*

■ Defendants assert in response to Plaintiff's supplemental factual submission that Smith has failed to prove that any of them violated the clearly established constitutional duty of not selectively denying law enforcement protective services to a disfavored minority. They assert that Smith has not presented anecdotal or statistical evidence that he was treated differently than similarly situated individuals. Further, they argue that Smith has failed to demonstrate that the Sheriff's Department intentionally discriminated against him on the basis of race. In short, Defendants assert that Smith has failed to show the requisite evidentiary nexus between the derogatory racial statement and the actual law enforcement decisions.

Specifically, Defendants assert that the investigative decisions made by the Sheriff's Department and its individual officers were based on standard operating procedures. Defendants argue that there are numerous factors other than race which explain their actions, including that Smith lacked credibility as a witness based on the number of times he "cried wolf," failed to report incidents in a timely fashion, and offered vague, generalized, unsubstantiated and often contradictory and inconsistent versions of the events to the Sheriff's Department.

Thus, I must now determine whether each of the Defendants' conduct violated the clearly established law. *See Workman v. Jordan,* 32 F.3d 475, 479 (10th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1357, 131 L.Ed.2d 215 (1995). This requires Smith to come forward with specific facts which, if true, would establish the violation. *Taylor v. Meacham,* 82 F.3d 1556, 1559 (10th Cir.), *cert. denied,* — U.S. —, 117 S.Ct. 186, 136 L.Ed.2d 125 (1996).

■ I believe that the detailed evidence presented by Smith as outlined above demonstrates that each of the Defendants violated clearly established law. Smith has shown that he was denied protection by each of the Defendants and the Sheriff's Department in instances where it is undisputed that he sustained injuries, gave good leads to the Defendants, and/or that evidence existed of the crime. Further, although Defendants present evidence that they had valid reasons for their actions, I believe that Smith has presented evidence sufficient to create a genuine issue of material fact that race was a motivating factor in the failure to protect Smith sufficient to avoid summary judgment.

In that regard, it is undisputed that Defendants declared unfounded or failed to investigate alleged crimes about which Smith complained, even though they knew that at least some of these incidents were racially motivated. It is further undisputed that the racial component was not investigated by Defendants and that, in at least one egregious incident, no effort was made to register the crime as a hate crime. At the same time, Defendants referred to Plaintiff as "Nigger Roy," sanctioned the use of this term, and Defendant Anderle admitted that it was the pattern, practice, habit and custom in the Sheriff's Department to refer to Smith that way.

Finally, in the vehicular assault investigation where Trooper Kemper found red paint on Berube's bumper that matched the sign that was allegedly hit behind the place where Smith was standing, there is evidence that some of the Defendants told Trooper Kemper that Smith was just the "town nigger" whose claims were usually unfounded. The Sheriff's Department also took the case back from Trooper Kemper and decided not to prosecute the assault even though Defendants knew that Smith was complaining of racist treatment by them and even though there was evidence which could have led to the arrest of Berube.

This evidence also creates a genuine issue of material fact as to pretext. As the Tenth Circuit stated in *Randle v. City of Aurora,* 69 F.3d 441 (10th Cir.1995):

Discriminatory animus *may be inferred* from the simple showing of pretext.... Consequently, because a jury may find illegal discrimination upon nothing more than

a prima facie case and pretext, such a showing at the summary judgment stage is sufficient to get the case to the jury. This conclusion flows directly from the Supreme Court's analysis in *St. Mary's Honor Ctr.*, where the Court observed that 'rejection of the defendant's proffered reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination.'
*Id.* at 451 (quoting *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510–11, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993)).

Other evidence which demonstrates pretext includes the evidence presented by Smith that (i) Defendants stated that Smith wanted to be called "Nigger Roy" when there is no evidence to support this; (ii) the affidavit of Ann Collopy on this issue appears to have been contradicted by her deposition testimony; (iii) the affidavits submitted by Forristal and Dixie Lovingier appear to be contrary to the Defendants' earlier interrogatory response stating that the only person at the Sheriff's Department who Smith introduced himself to as "Nigger Roy" was Ann Collopy; (iv) the interrogatory response of Defendants wherein they state that Smith has never been called by "Nigger Roy" when at least some of the Defendants admit calling him this; (v) the statement to Channel 9 News that Smith was chemically imbalanced when there was no evidence of this; (vi) the failure of Defendants to fully investigate Smith's claims even when there were documented injuries and good leads provided by Smith; (vii) the admission by Ray Kechter of the District Attorney's office in his deposition that the investigation regarding at least one of the incidents was not competent law enforcement or investigation; (vii) the affidavit of Kechter stating that, contrary to his deposition testimony, the work done by the Sheriff's Department on behalf of Smith was competent; and (viii) the statement in Kechter's affidavit that he reviewed all the records of the Sheriff's Department when he admitted in his deposition that the only records he reviewed regarding Smith's complaints were those related to the vehicular assault.

■ Contrary to Defendants' argument, Smith does not have to establish that race was the sole factor in connection with the violation of clearly established law. As the Tenth Circuit stated:

> [i]t is not necessary to demonstrate that the challenged action was taken solely for discriminatory purposes; it is necessary only to prove that a discriminatory purpose was *a* motivating factor.

*Watson,* 857 F.2d at 694; *see also Village of Arlington Heights v. Metro Housing Dev.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563–64, 50 L.Ed.2d 450 (1977); *Asbury v. Brougham,* 866 F.2d 1276 (10th Cir.1989); *Sampson v. Norwest Financial, Inc.,* 94 F.3d 656 (10th Cir.1996) (unpublished opinion).

■ Further, I disagree with Defendants that Smith has to present statistical or anecdotal evidence that other black people, or similarly situated people, were discriminated against in order to prove his claim. As the Supreme Court stated in *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986):

> [A] consistent pattern of official racial discrimination is not a necessary predicate to a violation of the Equal Protection clause. A single invidiously discriminatory governmental act is not immunized by the absence of such discrimination in the making of other comparable decisions.... For evidentiary requirements to dictate that 'several must suffer discrimination' before one could object ... would be inconsistent with the promise of equal protection to all.

*Id.* at 95–96, 106 S.Ct. at 1722 (citations omitted); *see also Bohen v. City of East Chicago, Ind.,* 799 F.2d 1180 (7th Cir.1986) (an equal protection plaintiff need not prove a discriminatory policy toward an entire class; discrimination against the plaintiff because of h[is] membership in a class is by itself enough).

I recognize that the Tenth Circuit held in *Watson* that "normally a plaintiff must point to facts outside the plaintiff's own case to support the allegation of an unconstitutional municipal policy" and that "[w]e doubt whether evidence of deliberate indifference in the plaintiff's case alone would be sufficient evidence of *different* treatment." However, the Tenth Circuit further stated

[T]he plaintiff's version of events regarding her own situation, if believed, may demonstrate a pattern of deliberate indifference on the part of the Police Department. Such a pattern, *when examined in the context of other evidence the plaintiff has presented,* constitutes evidence of a custom or pattern.... When all of the plaintiff's evidence is considered, it is sufficient, if believed, to support a jury finding that the City and Police Department followed a policy or custom of affording less protection to victims of domestic violence than to victims of nondomestic attacks.

*Id.,* 857 F.2d at 696 (emphasis added).

Similarly, in this case, Smith demonstrated not only a pattern of deliberate indifference on the part of the individual officers and the Sheriff's Department, but also presented direct evidence of racial slurs that was sanctioned by the Sheriff's Department. As the Third Circuit noted in *Mody,* evidence of racial slurs by the police or evidence of an atmosphere of disparagement towards minorities among the police that was knowingly tolerated by the officials responsible for the police conduct may be evidence of racial animus. *Id.,* 959 F.2d at 467. Further, Smith has presented evidence that he was treated differently than white people with similar complaints, particularly in connection with assault cases.

Finally, Smith has presented evidence that the Defendants knew of at least one individual, Smith's neighbor Berube, who was alleged to have perpetrated an attack on Smith (the vehicular assault), knew that this attack was racially motivated, and knew that he had allegedly engaged in other incidents such as allowing his dogs to bite Smith but failed to apprehend Berube or take any action. The court found in *Hawk* that similar facts provided a reasonable inference that racial animus was the reason for the police defendants' inaction. *Id.* 642 F.Supp. at 385. Accordingly, I find that the foregoing evidence is suffi-

cient to create a genuine issue of material fact as to this issue.[4]

Once Smith demonstrates that the Defendants violated clearly established law, then the Defendants bear the burden, as ordinary movants for summary judgment, of showing that no material issues of fact remain that would defeat the qualified immunity claim. *Mick v. Brewer,* 76 F.3d 1127, 1134 (10th Cir.1996). In the case at hand, much of the key evidence presented by Smith is controverted by Defendants, including whether their actions were objectively reasonable. Accordingly, I find that Defendants have failed to meet their burden of showing that no genuine issue of fact exists, and I find that qualified immunity is not available to the Defendants. Thus, it is

ORDERED that Defendants motion to dismiss or in the alternative, motion for summary judgment is DENIED as to the claims of qualified immunity asserted by the Defendants.

4. This result seems particularly compelling since the evidence demonstrates that there are virtually no black citizens in the County. At the December 20, 1996 hearing, counsel for Defendants stated that there were fewer than 14 blacks out of approximately 3500 residents (less than one-half of one percent) in Gilpin County. It would be difficult, if not impossible, for Smith to demonstrate a pattern and practice of treating blacks differently than whites based on the dearth of blacks in the County. Therefore, requiring Smith to present such evidence contravenes the very purposes for which the equal protection laws exist.